## KMI CONTINENTAL OFFSHORE PRODUCTION CO., et al., Appellants,

v.

## ACF PETROLEUM CO., et al., Appellees.

No. 01–86–0054–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 15, 1987.

Rehearing Overruled March 3, 1988.

---

**1.** See *McClendon v. State*, 583 S.W.2d 777, 779, 780 (Tex.Cr.App.1979); *Ashabranner v. State*, 557 S.W.2d 774, 778 (Tex.Cr.App.1977).

Larry R. Veselka, Jane F. Warmack, Vinson & Elkins, Houston, for appellants.

Reinnette Morin Marek, Michael L. Grove, Charles E. Frost, Jr., Chamberlain, Hrdlicka, White, Johnson & Williams, K. Charles Peterson, Reynolds, Allen & Cook, Houston, for appellees.

Before DUGGAN, HOYT and LEVY, JJ.

## OPINION

LEVY, Justice.

KMI Continental Offshore Production Co. ("KMI") and Florida Exploration Company ("Florida") appeal from a summary judgment entered against them. The dispute centers around an oil and gas exploration agreement the parties entered into and

whether KMI and Florida timely exercised an option available to them by the agreement. We hold that KMI and Florida did not timely exercise their option, and affirm the judgment.

On January 1, 1976, Florida, ACF Petroleum Co. ("ACF"), and Chessie Resources, Inc. ("Chessie"),[1] entered into an oil and gas exploration agreement called the Midland III Agreement. Florida was the agent for the venture and was responsible for acquiring and operating oil and gas prospects. ACF and Chessie were "non-operating participants" and primarily contributed their money to the venture, although they were involved in many of the decisions made by the venture. Each company held an interest in the properties purchased for the venture.

In addition to the initial interest it held in the prospects, Florida was given an option to acquire 20% of the nonoperating participants' interests in all wells drilled for the venture that were designated "Tested Prospects." The option was to run for "ninety (90) days from the date the parties have agreed in writing to be a Payout Date...." "Payout Date" was defined as the date on which certain expenses equaled certain revenues. The determination of Payout Date was necessary for defining the period within which Florida's option could be exercised.

The parties terminated the agreement on December 31, 1981, but agreed that the option would survive the termination. They did not attempt to divide certain of the jointly owned property upon termination either, but continued to hold undivided interests, among which were the Tested Prospects. Not until July, 1984, did any of the parties again communicate concerning the ownership of the properties in issue in this lawsuit. At that time, ACF requested from Florida records and assignments of interest on several Tested Prospects for which it had not received assignments of interest. No response was received to this request, so a second request was sent in

August of 1984. On September 7, 1984, Florida notified ACF and Texas Gas (Chessie Resources' successor in interest) that payout had occurred for the Tested Prospects from the fifth calendar year of the Midland III Agreement. Florida requested that the parties get together to agree on the Payout Date.

ACF and Texas Gas agreed that payout had probably occurred in 1982. However, because nearly two years had passed since the estimated Payout Date, ACF and Texas Gas maintained that the contractual time period for exercising the option had expired. In fact, by June of 1983, ACF and Texas Gas had concluded, from records sent to them by Florida, that the Payout Date had occurred and, by late 1984, assumed that Florida's option had long since expired. They demanded that Florida send them their assignments of interest for the disputed properties. Florida eventually complied with their request, but assigned them only 80% of their interests, retaining the additional 20% interest it believed it could acquire under the option, in spite of its lengthy delay in reporting the passing of Payout Date.

When the parties could not reach an agreement concerning the additional 20% interest Florida claimed to own, ACF and Texas Gas filed suit and moved for summary judgment, alleging six bases for entry of the summary judgment: 1) the contract unambiguously requires Florida to exercise its option within 90 days from Payout Date, which Florida failed to do; 2) Florida was estopped from asserting its option; 3) Florida waived its right to exercise the option; 4) the option provision violates the Rule Against Perpetuities; 5) the option provision is legally deficient for lack of a time provision; and 6) Florida did not exercise the option within a reasonable time after Payout Date. Appellants claimed in a cross-motion for summary judgment that the contract unambiguously provides for the option to run, not from Payout Date,

---

1. Chessie's interests in the contract were assigned to Texas Gas Exploration Company, which is one of the appellees in this appeal. All references to Chessie include Texas Gas and vice versa. Florida's interests in the agreement were assigned to KMI sometime after the dispute began. All references to Florida include KMI and vice versa.

but from the date the parties agreed in writing on the date Payout occurred and, therefore, that the option period had not yet begun because no agreement in writing had been reached. The trial court overruled appellants' motion for summary judgment and granted the motions of ACF and Texas Gas for summary judgment, without specifying its reasons for granting their motions.

Appellants raise seven points of error in this Court. They first claim that the trial court erred because the contract unambiguously provides for the option period to begin to run from the date upon which the parties agreed in writing that Payout occurred on a particular date. They next claim that even if the contract is found to be unambiguous, they raised a fact issue concerning what the parties intended the option provision to mean. In their third and fourth points of error, appellants claim that the trial court erred in granting the summary judgment because they did not waive their rights to exercise the option, nor were they estopped from exercising the option. In the fifth point of error, they claim that the provision does not violate the Rule Against Perpetuities, and in the sixth point of error they claim that the option provision was not legally deficient for lack of a time limitation. Finally, appellants claim that the trial court erred in denying their cross-motion for summary judgment.

■ We first consider appellants' claim that the contract is unambiguous and that the proper interpretation of the option provision is that it ran for 90 days from the date the parties reached a written agreement concerning the date payout occurred. Both parties argue that the contract is unambiguous, and we agree with their conclusions, as explained more fully below. Their disagreement is over the proper construction of the option provision. In an instance such as this, when the contract is unambiguous and the parties disagree on how to construe the contract, our adjudicative function is to determine which interpretation gives effect to the parties' intentions as expressed in the contract. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 727 (Tex.1982).

It is the general rule of law of contracts that where an unambiguous writing has been entered into between the parties, the courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). [The intention of the parties] must be deduced not from specific provisions or fragmentary parts of the instrument, but from the entire agreement, because the intent is not evidenced by any part or provision of it, nor by the instrument without any part or provision of it, but by every part and term so construed as to be consistent with every other part and with the entire contract.... The actual intent of the parties when thus ascertained must prevail over the dry words, inept expressions, and careless recitations in the contract, unless that intention is directly contrary to the plain sense of the binding words of the agreement. *Witherspoon Oil Co. v. Randolph,* 298 S.W. 520, 522 (Tex.Comm'n App.1927, judgm't adopted); *see also Coker v. Coker,* 650 S.W.2d 391, 393–394 (Tex.1983).

■ Those provisions that appear to be in conflict should be harmonized. *McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341 (1957). Evidence of the circumstances surrounding the execution of the contract should be considered, but the circumstances are merely an aid in the construction of the contract's language. Moreover, the circumstances to be considered are not the parties' statements of what they intended the contract to mean, but circumstances known to the parties at the time they entered into the contract, such as what the industry considered to be the norm or reasonable and prudent. We also must factor into our consideration that we are construing a purchase option, which is to be construed in favor of the buyer, and so interpreted as to give the option

effect rather than another interpretation that would render the option meaningless. *Coker v. Coker*, 650 S.W.2d at 394; *Sinclair Refining Co. v. Allbritton*, 147 Tex. 468, 218 S.W.2d 185, 188 (Tex.1949).

In examining the contract, we find that Florida was required as agent of the venture to direct and supervise the venture, to maintain offices, to obtain legal and independent geological, engineering, and other services, to recommend properties to consider for the venture, and "to maintain such records and accounts as are customary in the industry and as may be necessary to fulfill the requirements and obligations elsewhere set forth in this Agreement." Payout Date is determined from a formula based on the revenues and expenses of the Tested Prospects. Tested Prospects Expenditures, which comprise part of the formula, are defined in the following way:

At the end of the First calendar year, the Second calendar year, the Third calendar year and each subsequent actual calendar year, both during and after the term of this Agreement, a determination shall be made by Florida and each Non–Operating Participant of such Non–Operating Participant's total of (i) all overhead costs which it incurred in that particular calendar year and (ii) all Exploration Expenditures which it has made in connection with all geological prospects which became Tested Prospects in that particular calendar year, such total being referred to herein as "Tested Prospects Expenditures."

Payout Date is a date certain under the contract and occurs when Tested Prospects revenues equal Tested Prospects expenditures plus interest:

On such date as the amount of such Non–Operating Participant's share of the Net Production Revenues and Other Revenues from the Tested Prospects which became Tested Prospects in a particular calendar year, when applied first against the interest set out in (y) below and then to the unrecouped balance of expenditures as set out in (x) below equals the total of the amount of (x) its share of the Tested Prospects Expenditures for that same calendar year, plus (y) simple interest on the unrecouped balance thereof at the end of each month at the per annum rate of 125% of the average prime rate of the Citibank during the preceding calendar (which date shall hereinafter be called "Payout Date.") ...

The option provision immediately follows the above definition of Payout Date:

Florida shall have an option for a period of ninety (90) days from the date the parties have agreed in writing to be a Payout Date, exercisable by written notice, to acquire title to an undivided twenty percent (20%) of such Non–Operating Participants' interest in all of such Tested Prospects in all of the wells, the future production therefrom, and in all facilities, materials and equipment located thereon....

Each Payout Date shall be agreed upon by Florida and each Non–Operating Participant in writing; provided, further, that in the event Florida and any Non–Operating Participant are unable to agree upon the Payout Date within thirty (30) days following receipt of written notice from either one declaring such date to have occurred, either party may cause an independent audit by a nationally recognized firm of certified public accountants to be made for the purpose of establishing such date, the cost of such an audit to be shared equally by such parties.

These are the pertinent provisions of the contract. Three important facts are evident from the above provisions: 1) Florida was in charge of keeping the records and accounts for the venture; 2) the determination of Payout Date was based on calculations dependent upon events that occurred during the full course of a calendar year and, therefore, Payout Date, by its very definition, was undeterminable for a particular calendar year until the end of that calendar year; and 3) the parties were required to agree in writing on Payout Date.

The general tenor of the agreement is for accountings to be made at year's end and, therefore, for the Payout Date for a

particular calendar year to be determined no earlier than the end of that calendar year. For example, we find nothing in the contract stating directly, or indirectly, that estimates are authorized to be used. Payout Date is to be calculated based on *actual* figures. Consequently, to be effective, the option must run from the date the parties agree in writing on Payout Date. Otherwise, for example, if the Payout Date for a calendar year was in July of that year, Florida would have to calculate Payout Date and obtain the other parties' written consent to Payout Date based upon incomplete information, for it would not be until the end of the year before Florida would know for certain which wells would become Tested Prospects. Appellees' interpretation would, accordingly, render the option meaningless in certain circumstances.

For this reason, we agree with appellants' interpretation of the contract as it relates to a functional definition of Payout Date.

Although we agree with appellants' interpretation of the agreement, it does not necessarily follow that we must reverse the judgment. Appellees' summary judgment may be valid if appellees are correct in their argument that appellants waited an unreasonable length of time as a matter of law before attempting to exercise their option, regardless of how we interpret the Payout Date.

Appellants claim that they did not know that Payout occurred until 20 months after Payout Date, when they notified appellees in their September 7, 1984 letter that Payout had occurred. At that time, they concluded that Payout Date occurred no later than December 31, 1982. They argue that they did not intend to waive their right to exercise the option and that a waiver could not occur without their intent to waive. Appellees allege that appellants' unreasonable silence and inaction for 20 months after Payout Date constitute a waiver of appellants' right to exercise the option. They claim that appellants could have determined Payout Date 16 to 17 months earlier, as was appellants' responsibility under the contract, and could have notified

them of its occurrence. They also argue that appellants used the additional time to speculate on the value of properties that are of a highly speculative nature.

■ A waiver of a right granted in a contract can occur in any of three ways: the right may be expressly renounced; the renunciation may also be shown when a party knowingly possessing the right is inactive or silent for such an unreasonable time that the intention to waive is implied; finally, a waiver can occur if a party knowingly possessing the right acts in such a manner that the party misleads the opposing party into believing that a waiver has occurred. *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). Consequently, appellants' inaction can constitute a waiver even though appellants now contend that they did not intend to waive their rights.

■ We have held that the option ran for 90 days from the date upon which the parties reached an agreement on when Payout Date occurred. There are no explicit time limitations in the contract specifying when the parties *had* to reach a written agreement on Payout Date, and thereby begin the time period within which appellants could purchase an additional 20% interest in the Tested Prospects. However, this does not mean that appellants had an unlimited time to notify appellees of Payout Date. When an option provision fails to impose a time limitation, courts will construe the provision to require that it be exercised "within a reasonable time." *King v. Brevard*, 378 S.W.2d 681, 686 (Tex.Civ.App.—Austin 1964, writ ref'd n.r.e.); *Hatt v. Walker*, 33 S.W.2d 489, 499 (Tex.Civ.App.—Dallas 1930, writ dism'd w.o.j.). Furthermore, when the material facts relating to whether a party acted in a reasonable time period are undisputed, a court can resolve the issue as a matter of law. *Lusher v. First National Bank*, 260 S.W.2d 621, 626 (Tex.Civ.App.—Fort Worth 1953, writ ref'd n.r.e.); *Hatt v. Walker*, 33 S.W.2d at 500. The question before us, then, is whether the undisputed material facts show as a matter of law that appellants waited an unreasonable length

of time to take the steps necessary to exercise their option.

■ These are the undisputed facts and the facts most favorable to appellants: all of the parties eventually agreed that Payout Date occurred on December 31, 1982. Not until more than 20 months later, on September 7, 1984, did appellants notify appellees that Payout Date had occurred. It appears from the record that the parties may not have corresponded at all during this period concerning the properties. When the parties finally contacted each other about the properties, it was not Florida, but ACF, that initiated the contact, requesting its assignments of interest in the Tested Prospects for the fifth calendar year of the Midland III Agreement. This contract by ACF was made in July of 1984. When Florida failed to respond to this first request, ACF sent a second letter. Finally, in September of 1984, Florida responded. For the first time, 20 months after the date upon which the parties all agreed Payout Date occurred, and only after two requests from ACF for its assignments of interest in the Tested Prospects, Florida tried to initiate the process defined in the contract for exercising its option.

Appellants claim the delay was because they did not know that Payout Date had occurred. This claim is untenable considering: 1) their responsibilities under the contract; 2) their own evidence on the length of time necessary to determine Payout Date; 3) the relatively short amount of time it took appellees—six months—to arrive at a Payout Date; 4) the value of the properties, worth almost two million dollars; and 5) the speculative nature of the properties.

Appellants were to maintain under the contract "such records and accounts as are customary in the industry and as may be necessary to fulfill the requirements and obligations elsewhere set forth in [the] Agreement." One of appellants' such obligations was to direct the exploratory program for the venture and to develop estimates of the costs associated with prospects. Appellants were also obligated to maintain the offices and records for the venture. Consequently, they had access to and, in fact, solely maintained, the records used to determine whether payout had occurred.

In spite of their duty to maintain the records, appellants give no explanation why they did not determine the Payout Date for the 1982 Tested Prospects until September, 1984. Appellants seem to try to explain the delay in the affidavit of Thomas P. McConn, one of their experts, but we find the testimony conclusory, not factual, and incapable of raising a fact issue. *Coan v. Winters*, 646 S.W.2d 655, 657–658 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.). By their own evidence, the least amount of time necessary to determine Payout Date would be three to four months, plus an additional three months to decide if they wanted to exercise the option. Thus, their expert testified that six to seven months was needed, far less than the 20 months it took them to determine Payout Date.

Appellants' position becomes more untenable when one considers that ACF, which did not have the same access to the business records as appellants, was able to calculate Payout Date long before it was notified by appellants that Payout had occurred for the fifth calendar year. In June of 1983, ACF calculated a specific Payout Date based on routine reports and monthly payment checks sent to it by appellants. ACF then requested Chessie Resources to calculate Payout Date, which it also did. We find it difficult to understand, and there is no evidence in the record to explain, why appellants could not also have calculated Payout Date at that time, particularly since they had the advantage of access to the records.

Finally, in addition to considering the above evidence, it is pertinent that the property involved is worth a great deal and is of a speculative nature. In an agreement reached between ACF and Florida to enable ACF to complete its sale of the Tested Prospects owned by it, ACF's option right alone was valued at $938,772. Moreover, the wells and land involved are oil and gas property, which is inherently spec-

ulative. The longer one delays in acting on an option concerning oil and gas property, the easier one is able to speculate on the value of the property at the other's expense. As was stated in *Hatt v. Walker*, 33 S.W.2d at 499:

> We know to-day, as a matter of fact of which courts will take judicial notice, that the existence of or the duration of the existence of petroleum within the limits of a particular tract of land is uncertain; that it is of a fugitive and wandering character, and that neither from the opinions of geologists, nor from the formation of the surface and other indications of land, can it be said with reasonable certainty that a tract of land is oil-bearing and, if so, to what extent, and that a value placed on a tract of land as oil-bearing land may overnight be ascertained to be of no value as such; that when a producing well has been brought in the duration of same is uncertain, as well as the amount of its output; that producing wells promising a fortune for a short time may become worthless within a fortnight and lands supposed to be underlaid with oil-bearing sands and thereby having an apparent value as such may, by the failure to bring in an oil well contiguous thereto, cease to possess such apparent value. Therefore, the making of the contract without a time limit when the option therein provided for should be exercised, the parties thereto are to be held to have executed said contract with a knowledge of the uncertainties of the duration of the then apparent conditions which gave rise to the valuation that the parties thereto acted upon, to be measured and determined by the necessity for prompt action, viz., action without any uncalled for delay, that is, such delay as would give to appellant the right to speculate upon the value of his investment to the detriment of appellee on account of changed conditions that should have been reasonably expected and could not be countered against.

Considering the terms of the contract, appellants' position as records-keeper for the venture, appellants' own evidence that Payout Date could be determined in six to seven months, and the value and speculative nature of the property involved, we hold that 20 months was an unreasonable and unfair length of time as a matter of law to wait to begin the process by which appellants would exercise their option. Their unreasonable delay—which we hold to be laches as a matter of law—caused the option to expire before they attempted to exercise it.

> ... (t)he principle of laches is applied with greater force when the matter relates to oil and gas property and to minerals—the substance of which is fugacious, and the diligence required is measured by months rather than years, each case depending on its own particular facts and circumstances.

*Murphy v. Johnson*, 54 S.W.2d 158, 164 (Tex.Civ.App.—Austin 1932, writ dism'd w.o.j.).

Appellants' third point of error is overruled.

Having concluded that the option expired before appellants attempted to exercise it, we affirm the judgment on that basis alone, which renders moot a discussion of the remaining points of error advanced by appellants.

The judgment is affirmed.