# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00405-CV

**GTE Southwest, Incorporated d/b/a Verizon Southwest/MCI Communications Corporation and MCI WorldCom Communications, Inc., Appellants**

**v.**

**Public Utility Commission of Texas; MCI Communications Corporation; and MCI WorldCom Communications, Inc./GTE Southwest, Incorporated d/b/a Verizon Southwest, Inc., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN1-00159, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

GTE Southwest Incorporated d/b/a Verizon Southwest (AVerizon@) sought judicial review of a final order issued by the Public Utility Commission of Texas (the ACommission@) that interpreted and enforced an interconnection agreement. MCI Communications Corporation and MCI WorldCom Communications, Inc. (AWorldCom@) intervened in the suit to defend the order and to request the district court to award interest accruing from the date of the order. The district court affirmed the order, but awarded interest only from the date of its judgment. In two issues, Verizon asks this Court to reverse the district court=s judgment because: (1) the Commission lacked jurisdiction to enter the order; and (2) even if

the Commission had jurisdiction, it erred as a matter of law in interpreting the agreement. WorldCom brings a cross-appeal complaining of the district court=s refusal to award WorldCom interest from the date of the Commission=s order. We will affirm the judgment of the district court in all respects.

## BACKGROUND

This case concerns an interconnection agreement between Verizon, an incumbent local telephone exchange company, and WorldCom, a new entrant in the local exchange telecommunications market.[1] The interconnection of networks between telecommunications carriers makes it possible for customers of different carriers to call one another. Thus, interconnection agreements are crucial for new entrants to compete in the local telephone market. Both federal and state laws have been enacted to promote competition in local telephone markets and to require interconnection and procedures for negotiating and enforcing such agreements. *See* Federal Telecommunications Act (FTA) of 1996, 47 U.S.C.A. '' 251-252 (West 2001); Public Utility Regulatory Act (PURA), Tex. Util. Code Ann. '' 60.121-.128 (West 1998).

---

[1] When the interim interconnection agreement was negotiated and executed, and throughout the parties= early disputes, the parties were called GTE and MFS. Prior to this appeal being filed, however, both changed their names. GTE became Verizon and MFS became MCI WorldCom. In their briefing, the parties refer to themselves by their current names; we will do the same.

In September 1996, Verizon and WorldCom entered into an interim interconnection agreement. The interim agreement contemplated a permanent agreement, which had not been completed by the time this dispute arose. Although the parties failed to seek the Commission=s approval of their interim agreement, and thereby did not comply with federal procedures set forth in section 252(e) of the FTA, they operated under the agreement for three years. *See* 47 U.S.C.A. ' 252(e).[2] But when a dispute over terms of the agreement arose, this failure to seek Commission approval became problematic.

In May 1999, WorldCom filed its first complaint with the Commission in Docket No. 20870, alleging that Verizon had breached the interim agreement by failing to comply with reciprocal compensation provisions for terminating local traffic. Reciprocal compensation arrangements establish the terms by which local exchange carriers (ALECs@) compensate each other for the use of the other=s networks. *See* 47 U.S.C.A. ' 251(b)(5), (c)(1) (West 2001). When an LEC=s customer places a local call to a customer of another LEC, the LEC whose customer initiated the call compensates the receiving LEC for transporting and Aterminating@ the call through its network. *Id*. WorldCom complained that Verizon refused to compensate for the termination of Verizon=s customers= calls to Internet Service Providers (AISPs@) that are WorldCom customers. The Commission dismissed the complaint without

---

[2] The FTA requires that A[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.@ 47 U.S.C.A. ' 252(e)(1) (West 2001).

prejudice, ruling that it lacked jurisdiction to consider a dispute arising under an agreement that it had not approved. *See* Tex. Pub. Util. Comm=n, *Arbitration Award (Dismissing Complaint)*, Docket No. 20870 (June 18, 1999).

In July 1999, WorldCom initiated a second proceeding in Docket No. 21088, seeking the Commission=s approval of the interconnection agreement *after the fact*, presumably so the Commission could then assert its jurisdiction to resolve the parties= contractual dispute. Verizon refused to join the application for approval, taking the position that the agreement was no longer in the public interest. Verizon asked the Commission to dismiss WorldCom=s application, insisting that Verizon=s joinder was necessary before the Commission could approve the agreement. The administrative law judge certified the following question to the Commission: Can the Commission approve an agreement, even if a signatory party does not support its approval?

The Commission considered the unique circumstances of the dispute: an agreement that was supported by both parties when it was signed; an agreement that was intended to govern the parties= dealings for an interim period until a final agreement was reached, but that had in fact been in effect for three years; and the parties= inadvertent failure to seek the Commission=s approval for the agreement because it Afell between the proverbial cracks.@ Tex. Pub. Util. Comm=n, *Order on Certified Issue*, Docket No. 21088 (Oct. 28, 1999) (citing Affidavit of Joseph A. Lazzara, the Verizon consultant responsible for negotiating the interim agreement in the summer of 1996). The Commission declined to answer the certified question but reversed its earlier decision that it lacked jurisdiction to settle this dispute. Referring to the unique facts outlined above, the Commission found that although the parties had failed to comply with the

FTA=s requirement that the Commission approve the interim agreement, the Commission nevertheless had jurisdiction to resolve the dispute under state law because PURA does not require the Commission=s prior approval of an agreement to vest the Commission with authority to review it. *See* Tex. Pub. Util. Comm=n, *Order on Certified Issue*, Docket No. 21088 (Oct. 28, 1999). Having determined that it could assert its jurisdiction under state law without first approving the agreement, the Commission then dismissed as moot WorldCom=s application for approval of the interim agreement. *See* Tex. Pub. Util. Comm=n, *Order*, Docket No. 21088 (Jan. 13, 2000).

Verizon sought judicial review of the Commission=s action, and the trial court affirmed its order. This Court reviewed that judgment in *GTE Southwest, Inc. v. Public Utility Commission*, 37 S.W.3d 546 (Tex. App.CAustin 2001, no pet.). The contractual dispute, including the issue of the Commission=s authority to hear the dispute under state law, was not before us in that cause. Rather, we limited our review to the dismissal of WorldCom=s application for approval of the interim agreement. *Id*. at 548. We held that because the Commission granted the relief that Verizon sought by dismissing WorldCom=s application, Verizon was not an aggrieved party and was therefore not entitled to seek judicial review of the Commission=s final order in Docket No. 21088. *Id*.

Meanwhile, WorldCom filed its third complaint, again seeking reciprocal compensation for termination of ISP calls under the interim agreement. Asserting its authority under state law,[3] the

---

[3] Because of the conclusions previously reached in the order on certified issues in Docket No. 21088, the Commission specifically directed that the administrative law judge not address Awhether the Interim Agreement is a valid agreement or is an agreement in the public interest@ nor Awhether the Commission has jurisdiction over the Interim Agreement or has jurisdiction over this dispute resolution.@ *See* Tex. Pub. Util. Comm=n, *Preliminary Order*, Docket No. 21706 (April 12, 2000).

**5**

Commission referred the dispute to the State Office of Administrative Hearings (SOAH), *see* Tex. Gov=t Code Ann. ' 2003.049(e) (West 2000), and identified three issues to be addressed: (1) whether the terms of the interim agreement make any distinction regarding traffic destined for ISP customers; (2) whether ISP traffic otherwise conforms to the term Alocal traffic@ in the interim agreement; and (3) what amount of compensation WorldCom is due, if any, for the termination of ISP traffic.[4] *See* Tex. Pub. Util. Comm=n, *Preliminary Order*, Docket No. 21706 (April 12, 2000).

The Commission affirmed the proposal for decision (PFD), including the findings of fact and conclusions of law, issued by the ALJ. The Commission=s final order concluded that ISP-bound traffic is compensable under the reciprocal compensation provisions of the interim agreement, and ordered Verizon to compensate WorldCom approximately ten million dollars for the termination of traffic which originated on Verizon=s network destined for WorldCom=s ISP customers during the period from October 1996 to October 14, 1999. *See* Tex. Pub. Util. Comm=n, *Order*, Docket No. 21706 (Oct. 4, 2000). Verizon filed suit in the district court for judicial review. WorldCom intervened and counterclaimed, requesting the district court to enforce the order and award interest accruing from the date of the order. The district court affirmed and enforced the order, and awarded WorldCom interest from the date of its judgment but not from the date of the Commission=s order. This appeal and cross-appeal followed.

## VERIZON=S APPEAL

---

[4] In addressing this issue, the administrative law judge was to determine the appropriate means for identifying ISP-bound traffic subject to such compensation.

*The Commission=s Jurisdiction to Interpret and Enforce the Interim Agreement*

In its first issue, Verizon contends that the district court erred by affirming the Commission=s assertion of jurisdiction over Aissues related to the interconnection of telecommunications providers@ contained in Subchapter G of PURA. *See* Tex. Util. Code Ann. '' 60.121-.128 (West 1998). According to Verizon, the Commission=s dispute resolution power under PURA does not give the Commission jurisdiction over post-agreement disputes, and therefore does not allow the Commission to interpret and enforce the interim agreement because here the dispute arose A*after* an agreement has been negotiated and implemented by the parties.@ And even if PURA does give the Commission the power to interpret and enforce interconnection agreements, Verizon argues, it would not apply here because it pertains only to resolution of disputes under *approved* agreements and it is undisputed that the interim agreement has never been approved. Appellees respond that various provisions of PURA, especially sections 60.122 and 60.126, expressly authorize the Commission to exercise jurisdiction over this matter and Ato enforce interconnection agreements regardless of whether or not they have been submitted to the Commission for review and approval.@ *See id*. '' 60.122, .126. We will hold that the Commission had jurisdiction to interpret and enforce the unapproved interim agreement in this case pursuant to its dispute resolution authority under section 60.126 of PURA specifically because the Commission resolved a dispute filed by a party to an interconnection negotiation that was ongoing and not yet successful. *See id*. ' 60.126.

Section 60.126 provides that the Commission Amay resolve a dispute filed by a party to a negotiation under Section 60.125(a).@ *Id*. Section 60.125(a) requires that A[t]elecommunications providers shall negotiate network interconnectivity, charges, and terms.@ *Id.* ' 60.125(a). According to Verizon, the

7

Commission improperly took jurisdiction pursuant to these provisions because the only reading of section 60.126 that is consistent with its text is that the provision gives the Commission authority to facilitate the negotiation of interconnection agreements by allowing it to resolve disputes that arise *during the negotiation process*. Verizon contends that because the interim interconnection agreement was a fully executed contract constituting successfully negotiated interconnection terms, the Commission improperly relied on section 60.126 to resolve a dispute that arose *after* Verizon and WorldCom had negotiated the interim interconnection agreement. We disagree that the interim agreement represented the successful culmination of the parties= interconnection negotiations. Rather, we favor the appellee=s position that Athe interconnection between Verizon and WorldCom *was* a matter of ongoing negotiation when the Commission took jurisdiction.@

In reviewing the Commission=s interpretation of its dispute resolution authority pursuant to PURA, we must emphasize that the Commission exercises the jurisdiction and powers conferred by PURA, *see* Tex. Util. Code Ann. ' 12.001, and is the agency charged with the enforcement of that statute. In cases involving agency decision-making, we apply a deferential standard of review. *See Southwestern Bell Tel. Co. v. Pub. Util. Comm=n*, 79 S.W.3d 226, 228 (Tex. App.CAustin 2002, no pet.). When an agency is charged with enforcement of a statute, we give serious consideration to the agency=s construction, as long as the interpretation is reasonable and does not contradict the statute=s plain language. *Id*. at 228; *see also Nabisco v. Rylander*, 992 S.W.2d 678, 681 (Tex. App.CAustin 1999, pet. denied); *Texas Citrus Exch. v. Sharp*, 955 S.W.2d 164, 168 (Tex. App.CAustin 1997, no pet.).

The Commission=s explanation for its jurisdiction in Docket No. 21088 is instructive. The Commission reviewed the interim agreement and found that Ait is unclear whether the parties intended it to serve as a negotiated interconnection agreement within the meaning of the FTA.@ Tex. Pub. Util. Comm=n, *Order on Certified Issue*, Docket No. 21088 (Oct. 28, 1999). The Commission then referred to Chapter 60, Subchapter G of PURA, specifically sections 60.125(a) and 60.126. *See* Tex. Util. Code Ann. '' 60.125(a), .126. In light of these provisions, the Commission concluded:

> Viewing the Interim Agreement as a step in the negotiation of a final interconnection agreement between [WorldCom] and [Verizon], the Commission . . . can resolve any dispute arising under the Interim Agreement. The Commission further concludes that the period for any such dispute is limited to the period commencing September 30, 1996 and ending October 14, 1999.

Tex. Pub. Util. Comm=n, *Order on Certified Issue*, Docket No. 21088 (Oct. 28, 1999).

Several factors convince us that the Commission correctly labeled the interim agreement as merely a Astep@ towards an interconnection agreement between Verizon and WorldCom. First, the agreement itself is entitled the AMFS/GTE Interim Texas Co-Carrier Agreement.@ The word Ainterim@ has been defined as Adone, made, or occurring for an intervening time.@ Black=s Law Dictionary 819 (7th ed. 1999). AInterim@ is also synonymous with Atemporary@ or Aprovisional.@ *Id*. The language of the agreement itself strongly suggests that interconnection arrangements between Verizon and WorldCom remained in negotiations. The temporary nature of the agreement is made explicit in the opening paragraphs of its first section (entitled ARecitals & Principles@). The first paragraph establishes that Athe Parties *intend to*

*negotiate* a permanent agreement pursuant to Section 251 of the Telecommunications Act of 1996, but desire to enter into an interim interconnection agreement *pending completion* of the permanent agreement under federal law.@ (Emphasis added.) The second paragraph states that the interim agreement Ais not intended by either Party to constitute compliance with the requirements of Section 251(c), of the Telecommunications Act of 1996.@ The third paragraph states that the parties Ahave agreed on *interim* interconnection terms and conditions.@ (Emphasis added.)

Verizon argues that, notwithstanding this language, section 60.126 gives the Commission jurisdiction to resolve a dispute concerning the interim interconnection agreement *only if* the dispute arises during *that* agreement=s negotiation. According to Verizon, because the interim agreement has been Asuccessfully negotiated@ and a dispute arisen over the meaning of its terms, any authority the PUC may have to resolve the dispute Acan arise only from the rules governing dispute resolution of agreements approved under Section 60.125(b) or the FTA.@ Verizon reads section 60.126 too narrowly. That provision makes no mention of a negotiated agreement; it merely refers to a Anegotiation.@ *See* Tex. Util. Code Ann. ' 60.126. Section 60.125(a) also makes no mention of agreements, but merely says that parties Ashall negotiate network interconnectivity, charges, and terms.@ *Id.* ' 60.125(a). Verizon has presented us with no authority for the proposition that parties cease to be engaged in a negotiation when they have executed an interim agreement. Verizon=s reliance on section 60.125(b) of PURA is therefore also misplaced. That section states: AIf interconnectivity, charges, and terms are *successfully negotiated*, the commission shall approve the interconnection rates.@ *Id.* ' 60.125(b) (West 1998) (emphasis added).

**10**

Here, only an *interim* agreement had been **A**successfully negotiated,**@** and in it the parties explicitly only agreed on **A***interim* interconnection terms and conditions**@** pending the completion of a *permanent* interconnection agreement. (Emphasis added.) The language of the interim agreement therefore belies Verizon=s suggestion that interconnectivity arrangements had been **A**successfully negotiated**@** at the time of its adoption.

The parties= conduct as reflected in the record also suggests that interconnection negotiations were ongoing when WorldCom brought its dispute with Verizon before the Commission. WorldCom and Verizon began negotiating interconnection terms and conditions in 1996. Those negotiations stalled, and WorldCom petitioned the Commission to arbitrate certain issues. *See* 47 U.S.C.A. **'** 252(b) (West 2001). WorldCom withdrew its petition on August 12, 1996, when the parties executed the interim agreement that purportedly resolved the open issues until the parties could finalize a permanent agreement. After executing the interim agreement, the parties continued to attempt to negotiate a permanent agreement. The parties had operated under the interim agreement for nearly three years when negotiations broke down and WorldCom filed this complaint with the Commission. Since then, the parties have resumed their attempt to successfully negotiate a permanent interconnection agreement. Overall, the parties= actions indicate that the interim agreement was essentially a stage in the negotiation process meant to address certain issues while the parties continued negotiating interconnection terms and conditions. Thus, we conclude that at the time WorldCom filed its complaint, the parties= interconnection negotiations were ongoing for the purposes of the Commission=s dispute resolution power under section 60.126.

**11**

Furthermore, there is no merit to Verizon=s position that applying section 60.126 of PURA to resolve this dispute circumvents the state and federal requirements that the Commission review and approve interconnection agreements before enforcing them. Verizon seems principally concerned that carriers will now A>successfully negotiate= the terms of an >interim= interconnection agreement, fail to request review or approval of that agreement, and simply have the [Commission] enforce it by calling it a >step= in the negotiation of some future contract.@ Verizon does not have a valid concern because when WorldCom filed its complaint with the Commission, the parties could not demonstrate Asuccessfully negotiated@ interconnection terms and conditions. We read section 60.126 to apply only to disputes where negotiations are ongoing; a permanent agreement with Asuccessfully negotiated@ interconnection rates must be approved before being interpreted and enforced by the Commission. *See* Tex. Util. Code Ann. ' 60.125(b). Therefore, we reject the Commission=s position that PURA generally allows the enforcement of all interconnection agreements regardless of whether they have been submitted to the Commission for review and approval.[5] Only Ainterim@ interconnection agreements in which interconnection has not yet been

---

[5] The Commission contends that its authority under the FTA is irrelevant to whether it has jurisdiction to interpret and enforce interconnection agreements pursuant to its authority under PURA. The Commission relies on section 60.122 of PURA to argue that its Ajurisdiction under PURA is unfettered by a

Asuccessfully negotiated@ can be interpreted and enforced pursuant to the Commission=s dispute resolution power under PURA section 60.126 when it has not yet been approved.

---

requirement that the [Commission] first approve an agreement before interpreting it.@ Section 60.122 states: AThe commission has exclusive jurisdiction to determine rates and terms for interconnection for a holder of a certificate of convenience and necessity, a certificate of operating authority, or a service provider certificate of operating authority.@ Tex. Util. Code Ann. ' 60.122 (West 1998). Because we hold that the Commission=s power to interpret and enforce the *interim* interconnection agreement in this case is based on its dispute resolution authority in section 60.126, we decline to consider whether the language of section 60.122 encompasses the broad adjudicative power necessary to interpret and enforce interconnection agreements as a general matter.

When the Commission first asserted jurisdiction over WorldCom=s complaint, it emphasized that its authority over the dispute was specific to the Aunique circumstances involved here@ because previously Adisputes related to interconnection agreements have arisen in the context of agreements executed and approved pursuant to federal law@ and therefore Ahave been resolved pursuant to the FTA and Commission rules implementing the FTA.@ Tex. Pub. Util. Comm=n, *Order on Certified Issue*, Docket No. 21088 (Oct. 28, 1999). Although we conclude that the Commission acted within its jurisdiction when it took the unusual step of interpreting and enforcing an unapproved interconnection agreement, we are confident that our holding will be limited to the unique circumstances where the parties fail to submit an Ainterim@ agreement for approval and delay in executing a permanent interconnection agreement.[6] As the Commission points out, AVerizon=s alleged concern about hordes of unfiled agreements is simply groundless. Seven years have elapsed since Verizon forgot to file the instant agreement. In that time, not a single other telecom provider has come to the Commission with a similar issue.@ We agree with the appellees that the Commission=s decision to interpret and enforce it in this particular case does not threaten the normal process by which interconnection agreements are reviewed and approved.

---

[6] Here, it is undisputed that Verizon had the responsibility to submit the interim agreement to the Commission for approval. Furthermore, it is not likely that a telecommunication provider will in the future do what Verizon did in the instant case: operate from an *interim* agreement which it failed to submit for approval, and then later oppose approval when that agreement is submitted to the Commission for its review.

14

To summarize, Verizon and WorldCom are telecommunication providers that, as required by section 60.125(a), had entered into negotiations over Ainterconnectivity, charges, and terms.@ Tex. Util. Code Ann. ' 60.125(a). While the broader interconnection negotiation was still ongoing, WorldComCa party to that negotiationChad a dispute with Verizon which was filed with the Commission. *See id.* ' 60.126. The Commission chose to resolve the dispute pursuant to its PURA authority, even though it had not approved the interim agreement. However, as evidenced by the language of the interim agreement and the parties= conduct, Ainterconnectivity, charges, and terms@ had not been Asuccessfully negotiated@ so as to implicate the approval requirement of section 60.125(b). *See id.* ' 60.125(b). Thus, based on the plain language of the applicable provisions, and giving serious consideration to the Commission=s construction of sections 60.125(a) and 60.126, we hold that on these facts the Commission=s decision to resolve the dispute pursuant to PURA was not improper or beyond the Commission=s statutory authority. *See Southwestern Bell*, 79 S.W.3d at 228. Accordingly, we overrule Verizon=s first issue.

*The Commission=s Interpretation of the Agreement*

The Commission found that ISP-bound traffic is Alocal traffic@ under the interim agreement (hereinafter Athe Agreement@) and therefore that AISP-bound traffic is compensable under the reciprocal compensation provisions of the Interim Agreement.@ The Commission considered several factors, including the language of the Agreement; the manner in which Verizon=s customers accessed ISPs; the technical nature of ISP-bound calls; the billing rates and billing techniques utilized by Verizon; and the common industry practice and understanding towards ISP-bound calls and billing. In its second issue, Verizon contends that the district court erred in affirming the Commission=s interpretation of the Agreement because

**15**

that interpretation (1) violates established rules of Texas contract law and (2) conflicts with the requirements of federal law.

## Texas Contract Law

We will first consider whether the Commission properly interpreted the Agreement as requiring reciprocal compensation for calls to ISPs. The Agreement itself provides that Texas law governs its interpretation; in addition, it has been held that state contract law principles govern the questions of interpretation of interconnection agreements and enforcement of their provisions. *See Southwestern Bell Tel. Co. v. Pub. Util. Comm=n*, 208 F.3d 475, 485 (5th Cir. 2000); *see also Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.*, 235 F.3d 493, 499 (10th Cir. 2000). Thus, the Commission required reciprocal compensation for calls to ISPs not because federal law requires such compensation, but because the Agreement, as interpreted under Texas state law, requires it.

Under Texas law, the primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.*; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Although parol evidence relating to the parties= intent is not admissible for the purpose of creating an ambiguity, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists. *Cardwell v. Sicola-Cardwell*, 978 S.W.2d 722, 727 (Tex. App.CAustin 1998, pet. denied). A contract is ambiguous only if, after applying appropriate rules of construction, it is subject to two or more reasonable interpretations. *Id*. Whether a contract is ambiguous is

**16**

a question of law for a court to decide by looking at the contract as a whole, in light of the circumstances present when the parties entered into the contract. *National Union*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 394.

Verizon contends that several provisions contained in the Agreement, in combination with other relevant circumstances, create an ambiguity as to the parties= intent concerning whether ISP-bound calls are Alocal traffic@ subject to reciprocal compensation. The Agreement requires the payment of reciprocal compensation for Alocal traffic,@ but does not specifically define that term. **It simply requires the parties to Areciprocally terminate POTS calls originating on each others= networks@ and to compensate, A[f]or the termination of local traffic,@ in an Aequal, identical and reciprocal rate of $.009 per minute.@ POTS (Plain Old Telephone Service) traffic is defined in the Agreement to include Alocal traffic (including mandatory EAS)** *as defined* **in [Verizon]=s tariff . . . .@ (Emphasis added.) In fact, the specific term Alocal traffic@ is nowhere defined in the tariff. However, the tariff does define the term Alocal service,@ which is Aexchange service available in a particular exchange for communication throughout the exchange area and to establish toll conne ctions.@[7] After reviewing this language, we agree with the Commission that**

> **nothing in the Interim Agreement . . . requires the parties and the Commission to treat ISP-bound traffic differently from any other traffic designated as local in terms of reciprocal compensation between [WorldCom] and [Verizon]. While ISP-**

---

[7] The tariff defines Aexchange@ as a Atelephone service consisting of one or more central office areas which provides for service within a specified area known as the AExchange Area.@ The tariff defines Aexchange area@ as the Aarea within which the Telephone Company will furnish complete telephone service at the exchange rates applicable within that area.@

**bound traffic is not mentioned in the Interim Agreement, reciprocal compensation under the Interim Agreement . . . applies to local traffic.**

**Although the Agreement does not require reciprocal compensation for calls to ISPs, it does not expressly exclude calls to ISPs from Alocal traffic@so that the parties would be required to treat ISP-bound traffic differently from any other traffic designated as local.**

**We are thus satisfied that the relevant portion of the Agreement, considering the contract as a whole and the surrounding circumstances at the time it was executed, can only be reasonably interpreted to include ISP-bound traffic within Alocal traffic.@ *See National Union*, 907 S.W.2d at 520; *Cardwell*, 978 S.W.2d at 727 (ATo determine whether a contract is ambiguous, we must look at the contract as a whole in light of the circumstances present when the parties made the agreement.@) (citing *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996)). In this case, the Commission properly relied on its expertise and prior experience in interpreting the relevant terms of interconnection agreements to determine the standard industry meaning of the terms Alocal traffic@and APOTS@at the time the Agreement was entered into.**

**Verizon=s contention that the Commission erroneously found the Agreement to unambiguously include ISP-bound calls within the meaning of Alocal traffic@**essentially constitutes a substantial evidence attack on the Commission=s fact findings. In a substantial evidence review, we first determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *See Nucor Steel v. Public Util. Comm=n of Tex.*, 26 S.W.3d 742, 748 (Tex. App.C Austin 2000, pet. denied). The test is not whether the

18

agency made the correct conclusion but whether some reasonable basis exists in the record to support the agency=s action. *Id.* We may not substitute our judgment for that of the agency, and we are prohibited from substituting our judgment as to the weight of the evidence on questions committed to agency discretion. *Id*. Here, the Commission considered the following evidence:

$ Verizon=s customers (end-users) access their ISP by dialing a 7- or 10-digit local number, which is generally stored in the customer=s computer.

$ ISP-bound calls act like any other local call from the customer=s perspective, from the standpoint of the switching functions performed by Verizon, and from the standpoint of the switching functions that are performed by any other carrier involved in handling the call.

$ Verizon provides exchange services to its end-user customers within what its tariff describes as the Aexchange area@ typically at flat-rate charges. From the standpoint of this local service, there is no difference between a typical local exchange call and a typical dial access connection to an Internet information destination; both are provided at a flat rate.

$ Local calls are billed at the Interim Agreement rate of $.009 per minute of use.

$ The NPA-NXX summaries also contain Verizon=s Originated Customer Numbers (OCNs). From this information, Verizon is able to compare the local calling scope of each NXX (which is determined by Verizon=s own local tariffs) with the physical location of WorldCom=s switches. Thus, Verizon is able to ascertain from the NPA-NXX level data that the calls are local calls.

$ It is common industry practice to use records in the billing process that have been summarized to the NPA-NXX level. WorldCom followed the industry practice of providing data by NPA-NXX summary.

*See* Tex. Pub. Util. Comm=n, *Order*, Docket No. 21706 (Oct. 4, 2000). Applying the appropriate deferential standard of review, we conclude that the evidence in the record reasonably supports the

**19**

Commission=s decision that at the time they executed the Agreement, **Verizon and WorldCom treated ISP-bound calls as local traffic.**

**In addition, we are convinced that the Commission considered ample evidence that in 1996, when this interim agreement and similar interconnection agreements were being negotiated, the telecommunications industry as a whole treated ISP-bound calls as terminating locally. For example, a 1996 report by the Federal Communications Commission (FCC) defined Atermination,@ for purposes of section 251(b)(5), as Athe switching of traffic that is subject to section 251(b)(5) at the terminating carrier=s end office switch (or equivalent facility) and delivery of that traffic from that switch to the called party=s premises.@** *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, *First Report and Order*, **11 FCC Rcd 15 (1996),** *aff=d in part, vacated in part on other grounds*, *Iowa Utils. Bd. v. FCC*, **120 F.3d 753 (8th Cir. 1997). Here, the ISPs are WorldCom=s customers, making WorldCom the terminating carrier. ATermination@ therefore occurs when WorldCom switches the call at its facility and delivers the call to Athe called party=s premises,@ which is the ISP=s local facility. The call can therefore be said to Aterminate@ locally at the ISP=s premises.** *See Southwestern Bell*, **208 F.3d at 486. Also, the United States Court of Appeals for the Fifth Circuit recognized that the FCC has Aheretofore embraced a custom of treating calls to ISPs as though they were local, terminating within the same local exchange network@ and that agreements like the one at issue here Ahad been negotiated in the >context of this Commission=s longstanding policy of treating this traffic as local.=@** *Id*. **(citing** *Implementation of the Local Competition Provisions in the*

**20**

*Telecommunications Act of 1996, Inter-Carrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd 3689 (1999)).[8]

Verizon objects that the above evidence is not A mere >surrounding circumstances= evidence,@ but is A instead extrinsic evidence that may not be admitted unless the contract is first determined to be ambiguous.@ Although extrinsic evidence is commonly used to show the intent of parties, or custom and usage in the industry, when contracts are deemed ambiguous, *see, e.g.*, *Monesson v. Champion Int=l Corp.*, 546 S.W.2d 631, 637 (Tex. App. C Tyler 1976, writ ref=d n.r.e.), it is also clear that even with unambiguous contracts courts may A consider the commercial context of the transaction.@ *Intratex Gas Co. v. Puckett*, 886 S.W.2d 274, 278 (Tex. App. C El Paso 1994, no writ). To elaborate on the point: A [Contracts] should be construed and given effect in terms of their environment at the time of execution. By environment, we mean the ordinary terms, customs and usages then in effect as these are evidence of the intent of the parties.@ *Id.* (citing *Atwood v. Rodman*, 355 S.W.2d 206, 216 (Tex. Civ. App. C El Paso 1962, writ ref=d n.r.e.)); *see also Southwestern Bell*, 208 F.3d at 486 (A The parties obviously agreed that A terminate@

---

[8] As further evidence that the industry commonly considered ISP-bound traffic to be A local traffic,@ we note that, by the end of 1996, five State commissions had already ruled that modem calls to ISPs are subject to reciprocal compensation. *See Southwestern Bell Tel. Co. v. Public Util. Comm=n*, 208 F.3d 475, 487 (5th Cir. 2000).

would mean whatever the telecommunications industry took it to mean at the time they signed the agreements, *i.e.*, in 1996 and 1997.@) (citing *Intratex Gas*, 886 S.W.2d at 278).

The Commission=s consideration of evidence regarding the actual physical nature of ISP-bound calls and the state of the industry at the time the Agreement was executed are circumstances that serve merely as Aan aid in the construction of the contract=s language.@ *KMI Cont=l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 241 (Tex. App.CHouston [1st Dist.] 1987, writ denied). This differs from a consideration of Athe parties= statements of what they intended the contract to mean,@ which *is* prohibited when construing unambiguous contracts. *Id.* Therefore, the Commission properly excluded Verizon=s self-serving testimony regarding Verizon=s intent when entering into the Agreement.[9] If it had been the intent of the parties to exclude ISP-bound traffic from the Agreement=s reciprocal compensation provisions, it would have been simple to provide as much. The Agreement=s failure to make a distinction between calls to ISPs and other local traffic, coupled with the technical and industry-norm circumstances existing at the time the Agreement was executed, leads us to conclude that the parties, including Verizon, viewed ISP-bound traffic to be local and intended that traffic to be covered by the reciprocal compensation provision of the Agreement. We hold that the Commission correctly interpreted the Agreement according to Texas law.

---

[9] According to Verizon, if Athis Court finds the Interim Agreement to be ambiguous . . . the [Commission] erred by excluding relevant extrinsic evidence offered by VerizonCspecifically, testimony by Howard Lee Jones . . . concerning Verizon=s intent when entering the contract.@ Because we find the relevant portions of the Agreement to unambiguously provide reciprocal compensation for Alocal traffic,@ including calls to ISPs, we need not further consider this argument.

We must now consider whether the Commission=s interpretation of the Agreement contravenes federal law. Verizon cites the FCC=s recent decision, *In the Matter of Starpower Communications*, 17 F.C.C. Rcd 6873 (April 8, 2002) (AStarpower@), to argue that the Commission=s rationale to support its interpretation Acannot survive as a matter of binding federal law.@ Verizon contends that the FCC=s analysis of two interconnection agreements between Starpower and Verizon Virginia (AVerizon Virginia agreements@) undermines the Commission=s reliance on its prior determinations C as well as decisions by other state commissions C as a basis for finding that the parties= reciprocal compensation obligations include ISP-bound traffic. According to Verizon, Athe FCC has directly held that the very cases upon which the Commission relied below are incorrect.@ We disagree.

Although the FCC concluded that the Verizon Virginia agreements did not obligate Verizon Virginia to pay reciprocal compensation for ISP-bound traffic, it was specifically because those agreements expressly referenced and incorporated the FCC=s Ahistoric reliance on an >end-to-end= analysis of traffic for determining the traffic=s jurisdictional nature.@ *Id*. at 6891, & 41. Here, it is undisputed that the Aend-to-end@ jurisdictional language appearing in the Verizon Virginia agreements does not appear in the Agreement at issue. The FCC did not Afind dispositive the many state regulatory commission decisions . . . holding that ISP-bound traffic is subject to reciprocal compensation@ merely because Anone of these decisions specifically construes the contractual language at issue in this case, which . . . makes the jurisdictional nature

23

of traffic determinative of whether it constitutes compensable >Local Traffic.=@ *Id*. at 6890, & 39. The FCC=s interpretation of the Verizon Virginia agreements has no bearing on this case.

Furthermore, the FCC=s interpretation in *Starpower* of a third interconnection agreement C the Starpower-Verizon South agreement (AVerizon South agreement@) C supports the Commission=s decision in this case. The FCC found that the Verizon South agreement obligated reciprocal compensation for the delivery of ISP-bound traffic because the definition of compensable Alocal traffic@ is derived from Verizon=s Virginia tariff. *Id*. at 6892, & 44. Therefore, Awhatever calls Verizon South bills to its customers as local calls under the Tariff must be compensable local calls under the Starpower-Verizon South Agreement.@ *Id*. at 6894, & 49. Similarly, here the Commission made a factual finding that Verizon rates and bills its customers for a local call pursuant to the tariff when the customers call ISPs using telephone numbers associated with the customers= local calling area. This finding is supported by evidence contained in the record. *See Nucor Steel*, **26 S.W.3d at 748-49.** Verizon argues that its Texas tariff does not establish the scope of the parties= reciprocal compensation obligations because, unlike the Virginia tariff in *Starpower*, the Texas tariff defines Alocal service@ to include traditional long-distance voice calls that are not subject to reciprocal compensation under the Agreement. However, because the crucial inquiry under both the Virginia and Texas tariffs is whether customers= calls to ISPs are treated as local, we disregard this distinction and conclude that the FCC=s interpretation of the Verizon South agreement does not undermine the Commission=s interpretation of the Agreement.

We also reject Verizon=s assertion that FCC precedent makes clear that AInternet-bound calls are, *and always have been*, interstate, interexchange calls that terminate on the World Wide Web,@ and that there is thus a Afederal presumption@ against reciprocal compensation for calls to ISPs. (Emphasis added.) The FCC has applied its so-called Aend-to-end@ analysis to find that calls to ISPs are non-local and not within the scope of section 251(b)(5)=s provision for reciprocal compensation. *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd 3689, 3690, & 1 (1999) (ADeclaratory Order@) (citing 47 U.S.C.A. ' 251(b)(5)).[10] But the FCC also held that telecommunications providers are controlled by interconnection agreements that include ISP-bound traffic in their reciprocal compensation provisions. *Id*.; *see also Southwestern Bell*, 208 F.3d at 478. ATaking a hands-off approach, the FCC announced that it will not interfere with state commission determinations of whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic.@ *Southwestern Bell*, 208 F.3d at 478.

---

[10] In *Bell Atlantic Telephone Co. v. FCC*, 206 F.3d 1, 8 (D.C. Cir. 2000), the Declaratory Order was vacated and remanded because it failed to supply a real explanation for its decision to treat end-to-end analysis as controlling. According to the D.C. Circuit court, A[h]owever sound the end-to-end analysis may be for jurisdictional purposes, the Commission has not explained why viewing these linked telecommunications as continuous works for purposes of reciprocal compensation.@ *Id*. at 7.

Although the FCC has now definitively ruled that ISP-bound traffic is not subject to reciprocal compensation arrangements, it ordered that its ruling be prospective in application, to be applied only Aas carriers renegotiate expired or expiring interconnection agreements.@ *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151, & 82 (2001) (ARemand Order@). These FCC rulings have no effect on this Agreement, which covers the period from October 1996 through October 1999.[11] Thus, having held that the Commission correctly interpreted the Agreement under principles of Texas law to require reciprocal compensation for ISP-bound traffic, we further hold that the Commission=s interpretation and enforcement of the Agreement does not in any way conflict with the FTA or recent FCC rulings dealing with reciprocal compensation for ISP-bound traffic. We overrule Verizon=s second issue.

## WORLDCOM=S CROSS-APPEAL

---

[11] To illustrate the purely prospective application of the FCC=s rulings on ISP-bound traffic, we note that in *Starpower,* decided after the Remand Order, the FCC interpreted an interconnection agreement to require reciprocal compensation for ISP-bound traffic and reaffirmed that the Remand Order did not apply to existing agreements like the one at issue here. *In the Matter of Starpower Communications*, 17 F.C.C. Rcd 6873, 6882, & 23 (April 8, 2002); *see also Verizon Md. v. RCN Telecom Services*, No. S-99-2061, 2003 U.S. Dist. LEXIS 3579, at *43-47 (D. Md. March 5, 2003).

**In its final order, the Commission ruled that the Agreement requires the parties to pay each other Areciprocal compensation@ for the exchange of calls to ISPs.** *See* Tex. Pub. Util. Comm=n, *Order*, Docket No. 21706 (Oct. 4, 2000). In a Compliance proceeding, the Commission confirmed that Verizon owed WorldCom reciprocal compensation payments in the amount of $9,898,113.28. *See Notice of Approval of Compliance Calculations*, Docket No. 23072 (April 13, 2001). Verizon challenged the Commission=s order in the district court. WorldCom counterclaimed, including a request that the district court award interest accruing from the date of the order, October 4, 2000. The district court affirmed the Commission=s order and awarded WorldCom interest from the date of its judgment, *see* Tex. Fin. Code Ann. '' 304.001, .003-.006 (West Supp. 2003), but denied the request for interest from the date of the Commission=s order.

According to WorldCom, the judgment awarding damages for breach of contract was the Commission=s October 4, 2000 order, and thus it is entitled to interest from the date of the Commission=s order, not just from the district court=s judgment. We disagree. WorldCom relies on provisions of the finance code which expressly limit the award of postjudgment interest to a Amoney judgment of a *court* of this state.@ *Id*.[12] (Emphasis added.) WorldCom cites language from this Court in *Robertson County v. Wymola*, where we stated that Aevery valid judgment bears post-judgment interest under the law.@ 17 S.W.3d 334, 344 (Tex. App.CAustin 2000, pet. denied). However, that case concerned a valid *court*

---

[12] For example, section 304.001 states: AA money judgment of a court in this state must specify the postjudgment interest rate applicable to that judgment.@ Tex. Fin. Code Ann. ' 304.001 (West Supp. 2003). Section 304.005 states in part that Apostjudgment interest on a money judgment of a court in this state accrues during the period beginning on the date the judgment is rendered and ending on the date the judgment is satisfied.@ *Id*. ' 304.005(a) (West Supp. 2003).

judgment, not an administrative order. *Id*. Because WorldCom provides us with no authority for the proposition that an administrative award of compensation bears interest from the date of the order, we overrule its issue on cross-appeal.

## CONCLUSION

For the reasons set forth above, we overrule Verizon=s issues on appeal. We also overrule WorldCom=s issue on cross-appeal. We affirm the judgment of the district court in all respects.


W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   March 20, 2003