GORBETT BROS. STEEL COMPANY, INC., Appellant,

v.

ANDERSON, CLAYTON & COMPANY, Appellee.

No. 16542.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Jan. 29, 1976.

Locke, Purnell, Boren, Laney & Neely, Larry M. Lesh, Dallas, Liddell, Sapp, Zivley & Brown, Jess H. Hall, Jr., Houston, for appellant.

Fulbright & Jaworski, Blake Tartt, Richard N. Carrell, Houston, for appellee.

PEDEN, Justice.

Defendant, Gorbett Bros., appeals from a judgment awarding $101,080.83 to Anderson, Clayton & Co. (ACCO), as damages resulting from the collapse of a soybean tank fabricated and erected by Gorbett Bros. The tank was built in Osceola, Arkansas, pursuant to a purchase order contract, and ACCO paid Gorbett Bros. $34,590 for it. Several years earlier, Gorbett had submitted detailed blueprints for the fabrication and erection of similar surge tanks which it later built for ACCO under a 1966 agreement at Vicksburg, Mississippi. Then, when ACCO decided to build the tank in question at Osceola, it enclosed with its invitations to bid an autopositive print of one of the drawings Gorbett had made for the Vicksburg job. ACCO labeled it ACCO SK111–M1626.

After a non-jury trial, the judge made findings of fact (which we have condensed) concerning liability: 1) Gorbett Bros. entered in a contract with ACCO whereby Gorbett Bros. sold, designed, fabricated and erected one 40 foot by 54 foot, 6-inch soybean holding surge tank with cone bottom (hereinafter referred to as the "tank") at

ACCO's facility near Osceola, Arkansas; 2) Gorbett Bros. is a wholly owned subsidiary of Trinity Industries, Inc.; 3) ACCO paid Gorbett Bros. the full contract price for the design, fabrication and erection of the tank; 4) the tank collapsed upon its initial use April 8, 1972, through no fault of ACCO; 5) Gorbett Bros. was, at all pertinent times, engaged in the business of designing, selling, fabricating and erecting tanks such as the tank which collapsed; 6) Gorbett Bros., at all pertinent times, represented themselves to ACCO to be engineers, designers, fabricators and erectors of tanks such as the one contracted for by ACCO; 7) ACCO reasonably relied upon the representations of Gorbett Bros. in entering into the contract and in accepting and paying for the tank; 8) Gorbett Bros. knew that the tank was to be used to hold large quantities of soybeans at all pertinent times; 8A) the tank furnished by Gorbett Bros. to ACCO failed to satisfy the purpose for which Gorbett Bros. knew it to be intended; 8B) the tank furnished ACCO by Gorbett Bros. was defective at the time it was released to ACCO by Gorbett Bros.; 9) the defects in the tank at that time were such as to render the tank unreasonably dangerous; 10) such defects were a producing cause of the damages suffered by ACCO; 11) Gorbett Bros. was negligent in the design of the tank; 11A) such negligence was a proximate cause of the damages suffered by ACCO; 12) Gorbett Bros. was negligent in the erection of the tank; 12A) such negligence was a proximate cause of the damages suffered by ACCO; 13) Gorbett Bros. was negligent in the fabrication of the tank; 13A) such negligence was a proximate cause of the damages suffered by ACCO; 14) Gorbett Bros. was on notice of the defects in the tank; 15) Gorbett Bros. was negligent in failing to notify ACCO of the defects; 15A) such negligence was a proximate cause of the damages suffered by ACCO; 16) Gorbett Bros. knew that ACCO was relying upon the skill and judgment of Gorbett Bros. as a seller, designer, fabricator and erector of tanks, engaged in the business of selling, designing, fabricating and erecting tanks; 17) Gorbett Bros. impliedly warranted the fitness of the tank for the purpose for which it was to be used; 17A) Gorbett Bros. breached its implied warranty of fitness for a particular purpose; 17B) such breach was a proximate cause of the damages suffered by ACCO; 18) Gorbett Bros. impliedly warranted the merchantability of the tank; 18A) Gorbett Bros. breached that implied warranty; 18B) such breach was a proximate cause of the damages suffered by ACCO.

After considering the request of defendant Gorbett Bros. for additional findings, the trial judge made this response:

1. The agreement between Gorbett Bros., Inc., and ACCO relating to the tank at Osceola, was in the form of ACCO Purchase Order ID13731 dated April 5, 1971, providing, in language prepared by ACCO for the purchase of one:

"SOYBEAN HOLDING SURGE TANK 40'-0" dia. X 54'-6" shell, 27½ Degree conical roof, and 31 degree cone bottom, with two 24" manholes, fabricated in strict accordance with attached Drawing SK111–M1626. . . ."

Said agreement provided further:

"None of the terms and provisions contained in this Purchase Order may be added to, modified, superseded or otherwise altered except by a written instrument signed by an authorized representative of Buyer and delivered by Buyer to Seller, and each shipment received by Buyer from Seller shall be deemed to be only upon the terms and conditions contained in this Purchase Order except as they may be thus added to, modified, superseded or otherwise altered, and notwithstanding any terms and conditions that may be contained in any acknowledgment, invoice, or other form of Seller and notwithstanding Buyer's act of accepting or paying for any shipment or similar act of Buyer."

2. Drawing SK111–M1626 attached to and made a part of ACCO Purchase Order

ID13731 was an autopositive of a Gorbett Bros. design used by ACCO to indicate the desired dimensions of the tank for bidding purposes only. ACCO did not adopt the drawing as to sufficiency or fitness of design.

3. In the course of performing its obligations to design, fabricate and erect the tank under the agreement, Gorbett Bros. prepared and submitted to ACCO the requisite number of sets of manufacturer's drawings of the tank. In accordance with the terms of said agreement, said manufacturer's drawings incorporated the dimensions contained in Drawing SK111–M1626.

4 & 5. Defendant's Requests 4 and 5 are rejected. The Court finds that ACCO relied upon Gorbett Bros. as to the sufficiency of design and Gorbett knew or should have known, based on past dealings, usage and custom in the industry and the circumstances surrounding the purchase of the tank, that ACCO was relying upon Gorbett in this regard.

6. ACCO had its own Engineering Department, staffed by at least two Registered Professional Engineers who were involved in the preparation of the autopositive of the Gorbett design labeled Drawing SK111–M1626 and ACCO Purchase Order ID13731; however, ACCO did not undertake to design the tank nor in any way relieve Gorbett of such responsibility.

7. Gorbett Bros.' request for finding no. 7 is rejected as being in direct conflict with findings already made by the Court in accordance with the evidence.

8. Gorbett Bros.' request for finding of fact no. 8 is rejected as being in direct conflict with findings already made by the Court in accordance with the evidence.

9. In September of 1971, Gorbett Bros. Steel Company, Inc., completed the fabrication of the said soybean holding surge tank in Osceola and released the tank to ACCO, which paid for the same.

10. Gorbett Bros.' request for finding no. 10 is rejected as being in direct conflict

with findings already made by the Court under the evidence.

Gorbett's first point of error is that the trial court erred in awarding judgment to ACCO because the undisputed evidence showed that ACCO's acts caused the vessel to collapse. Gorbett's second point of error is that the trial court erred in using evidence of the 1966 agreement concerning the Vicksburg vessel to add inconsistent and contradictory terms to the 1971 agreement concerning the Osceola vessel.

In its next 54 points of error Gorbett challenges the findings of fact bearing the following numbers by no evidence and insufficient evidence points: 1, 3, 4, 7, 11, 11A, 12, 12A, 13, 13A, 14, 15, 15A, 16, 17, 17A, 17B, 18, 18A, 18B, and additional findings 2, 4 and 5, and 6. Gorbett also contends in these points that findings 5, 6, 7, 8, and 9 are irrelevant and immaterial.

In reviewing "no evidence" points we examine the evidence in its most favorable light, considering only the evidence and inferences which support the findings and rejecting the evidence and inferences contrary to them. In reviewing factual sufficiency points, we consider all the evidence.

Gorbett says that on the Vicksburg job in 1966, it was requested to and did submit to ACCO drawings of a tank with the cone resting on the foundation, and they were approved with a notation that the bottom of the cone be raised five feet, six inches above the foundation by raising the skirt that much. That on the Osceola job, ACCO selected the design of the vessels constructed in Vicksburg, placed ACCO's name and identification number, SK111–M1626, on the drawing and distributed it to various contractors to bid on a tank fabricated "in strict accordance with Drawing SK111–M1626." Gorbett alleges that the contract price of $34,590.00 paid by ACCO to Gorbett was strictly for fabricating and did not include payment for design of the vessel. Gorbett argues that the collapse of the vessel in Osceola "resulted from insufficiencies

attributable to Anderson, Clayton Drawing No. SK111–M1626 (the insufficient thickness of the skirt and insufficient design of the cone connection to the skirt) and/or modifications thereof made by (cutting the conveyor opening without any reinforcement whatsoever) or at the instruction of (raising the door) Anderson, Clayton."

As to the drawing sent to Gorbett, ACCO says it was merely to indicate the overall dimensions they required for the tank, the drawing was not sufficient to be used to make and erect a tank, and Gorbett Bros. designed, fabricated, and erected the tank at Osceola. There is sufficient evidence to support ACCO's position. Mr. Robert W. Greaser, chief engineer for ACCO, testified that in the last 25 years ACCO had done several million dollars worth of business with Gorbett, and ACCO had never sent a designed tank to Gorbett for construction. Rather, the practice was for ACCO to send an "inquiry" to describe the need as to function and physical dimensions. Mr. Cleon Gorbett, a former owner of Gorbett Bros. and presently an advisor, testified about the tank that his company designed and erected at Vicksburg. Gorbett Bros. engages in the business of designing and/or erecting tanks. People would give Gorbett sketches or drawings and show the dimensions they wanted and site location. "We put it in engineering, and it came out of there designed for erection." Mr. Gorbett testified that when he dealt with ACCO on the Vicksburg tanks he did not expect ACCO to run load tests and have an engineer for the drawings submitted for their approval, because the drawings were supposed to, and had been, engineered by Gorbett and the vessel would hold the load that it was supposed to. He was sure Gorbett Bros. made the drawing used in the Osceola job.

Mr. Bond, an ACCO engineer, testified that in requesting bids, ACCO gave the contractors only a general outline of its requirements, not any details of the tank, relying on whoever bid the job to prepare any detailed specifications. He said he felt that the Osceola job had already been designed, apparently referring to Gorbett Bros.' work.

Mr. John Davis, who was for 15 years a sales estimator for Gorbett, handled the Vicksburg and Osceola sales. He testified that Gorbett bid the Osceola job according to Drawing SK111–M1626 as requested by ACCO and that that one sheet was sufficient to erect the tank. However, he also said tank fabricators usually do the design work. He testified that the drawing furnished by ACCO was used by Gorbett for bidding. It did not contain any information concerning types of welds to be used, and Gorbett made its own drawings.

There is evidence that negligence in the design, fabrication, and erection of the tank proximately caused it to collapse. Mr. James Earthman, a consulting mechanical engineer, was qualified as an expert and gave his analysis and opinion of the causes. He stated that three areas in the tank were so excessively stressed that its failure could have taken place in any one of them: First, where the bottom cone connects to the shell, at the compression ring, there was a combination of fabrication and design problems. The area was overstressed; the girder itself was heavy enough, but attachment of it to the shell left the shell in such a condition that serious bending could take place there. Further, the drawings called for continuous welds, as they should have, but the bottom one was an intermittent or tack weld.

Second, the skirt itself was too thin. This was a design problem. The skirt was so thin that its buckling stresses were beyond ordinary design limits.

Third, the door opening was not reinforced properly. There was a serious problem of construction of the two-foot six by four-foot door in the bottom. The reinforcing steel wasn't run all the way to the bottom, so the load was not effectively carried into the base. In that second respect the tank as erected didn't agree with the drawings. The welds for the reinforc-

ing beam according to the drawings were to be run to the bottom of the tank. The tank did, in fact, lean and fall over in the general direction of the door opening. The door problem, he said, could be classified as one of either fabrication or design.

Mr. Earthman concluded that the failure of this tank was, in all reasonable probability, caused by overstressing in any one of the three areas he described or in a combination of the three. He could not pinpoint which problem area caused the collapse, because all three failed. He did not see the tank collapse and could not point to the cause of the initial failure.

A Dr. Michael Wilkinson, a faculty member at the School of Engineering at Louisiana Tech University and holder of a Ph.D. degree in mechanical engineering, testified for Gorbett. He testified that when materials were removed from the skirt its load-carrying capacity was reduced. The cutting out of the door is an example. To overcome this loss, reinforcement should have been placed around the door, but in this case errors were made in the manner in which it was done. He says an opening was cut for a conveyor and there is no clear evidence that any reinforcement was placed around that opening. (There is other testimony that ACCO cut the conveyor opening). He concludes that the cause of buckling was a combination of these two effects.

In the drawing originally prepared by Gorbett for Vicksburg, the cone was resting on the foundation, and if the one at Osceola had been built in that manner, there would have been no problem. He conceded, however, that the cone on the tank at Vicksburg did not rest on the ground but was up in the air like the one at Osceola. Mr. Wilkinson expressed the opinion that the use of the tack weld was a fabrication error and was a contributing factor in the collapse, but he minimized its effect. He would have designed the tank with a bigger margin of safety. Normally, heavier metal would be required for a shirt that holds the tank up, and a tank fabricator would probably know that. Considering the volume of the material stored in it, the vessel was tissue-paper thin.

Evidence on the issue of failure to warn of the defect comes from the testimony of Tommie E. Hood, who had been a boiler-maker, welder, and field foreman for Gorbett Bros. on the Osceola job. After inspecting the drawings he was of the opinion that the vessel would collapse because the shell was too weak, so he called Gorbett Bros. in Ft. Worth and gave this information to Bill Goodfellow, the field superintendent. Goodfellow responded that Gorbett Bros. is not in the engineering field and it was not for them to worry about; their job was just to erect the tank.

■ We find no merit in appellant's second point of error. Both parties offered evidence of the course of dealings between the parties and the circumstances surrounding the execution of the 1971 (Osceola) purchase order contract, including the customs and usages in the tank construction design, fabrication, and erection business and the sufficiency of the autopositive print for use in designing the Osceola vessel. This evidence was not in violation of the parol evidence rule. Even though the 1971 purchase order agreement was not ambiguous, the court was entitled to consider the surrounding facts and circumstances, not to vary or add to the contract, but to learn the intention with which the words were used. *Spence & Howe Construction Co. v. Gulf Oil Corp.*, 365 S.W.2d 631 (Tex.1963).

■ We hold that the evidence supports the trial court's findings, under the doctrines of negligence, of defective design, defective manufacture, and failure to warn of known dangerous characteristics. We have examined all of the evidence but have not discussed it all.

The appellant complains that the trial court erred in its findings on implied warranty, challenging the finding that it knew ACCO was relying on its skill. Appellant also denied that it impliedly warranted that the vessel was fit for a particular purpose,

that such warranty was breached or that the breach was a proximate cause of the damages.

■ We hold that the provisions of Section 2.315 of the Texas Business and Commerce Code are applicable under the evidence in this case. They state that an implied warranty for a particular purpose exists (unless modified or excluded under Sec. 2.315):

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, . . ."

At the time of contracting Gorbett Bros., through its agents, knew the tank was to hold a full load of soybeans. There is testimony by ACCO's engineers Bond and Greaser that ACCO relied on Gorbett's skill and judgment in the design, erection and fabrication of steel tanks. The evidence supports the findings that Gorbett breached its implied warranty of fitness for a particular purpose.

■ Gorbett Bros. challenges the finding that ACCO did not adopt the drawings of the Vicksburg tanks as to the sufficiency of design. This finding has sufficient evidence in the record to support it.

■ In points of error 57 through 63 the appellant complains that the trial court erred in failing to make additional findings of fact and conclusions of law that it requested. We overrule these points.

> ". . . Of course, the party requesting additional findings cannot compel the trial court to find in a particular way, but where particular named findings are requested, the trial court should respond to such request by finding as he may deem the record to justify." *Wagner v. Riske,* 142 Tex. 337, 178 S.W.2d 117 (1944).

In its last point of error the appellant complains that the trial court used an incorrect measure of damages in awarding ACCO $101,080.83; that the damages should have been based on 1) the difference in value of the vessel as built and as it should have been built under the contract or on 2) the difference in value of ACCO's premises in Osceola before and after the collapse.

■ We do not agree that ACCO's recovery must be so limited. ACCO has established its cause of action under theories of negligence, strict liability, and of breach of contract. Under negligence, one who is complaining of a wrongful injury can recover for such damages as are proximately caused by the injury complained of. It must appear that the wrongdoer could or should reasonably have foreseen that the injury complained of, or one of the same general character, would probably result from his wrongful conduct. *Commonwealth of Mass. v. Davis,* 140 Tex. 398, 168 S.W.2d 216 (1942).

■ The trial court was entitled to conclude that the consequences that would result if the tank collapsed were within the contemplation of the parties when they were negotiating. Gorbett Bros. was undoubtedly aware of the manpower, the cranes and other equipment that would be needed to move a steel structure of this tank's size and shape, to remove the debris, and to restore order to the grounds. Also, that Gorbett Bros. should have reasonably foreseen that if the tank collapsed soybeans stored in it would be lost or damaged.

> "The primary principle to be applied in awarding damages for negligent injuries to property is that the owner shall have actual pecuniary compensation for the loss sustained . . . ; where it has neither a market value nor a real value, but it is shown what it would cost to replace or reproduce the article, then such cost is the measure of recovery . . ." *International-Great Northern R. Co. v. Casey,* 46 S.W.2d 669 (Tex.Com.App.1932, opinion approved).

Under the trial court's findings, ACCO's damages fall into these categories:

| | | |
|---|---|---|
| 1. | Cost of replacement vessel designed, fabricated and erected by Webco | $53,333.00 |
| 2. | Total loss of 5,000 bushels of soybeans at $8 per bushel | 40,000.00 |
| 3. | Damage to 67,000 bushels of other soybeans | 20,120.00 |
| 4. | Labor, equipment and material used to clear away debris and prepare site | 31,635.09 |
| | Total | $145,088.09 |

The trial court, however, limited ACCO's recovery to the amount it had prayed for, $101,080.83. If we consider the entire $43,-807.26 reduction in ACCO's recovery to have been deducted from the first item, cost of the replacement vessel, then ACCO recovered only $9,526 for it. We hold that under the well-supported holdings of the trial court based on the theories of negligence and strict liability, the proper measure of damages included the reasonable cost of replacing the collapsed vessel. The contract price agreed upon by ACCO and Gorbett Bros. for the vessel that later collapsed was $34,590; it appears to us that a recovery of $9,526 for its replacement is reasonable.

Affirmed.