Opinion filed September 12, 2013



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00286-CV
_____

**HORSESHOE BAY RESORT, LTD., Appellant/Cross-Appellee**

**V.**

**CRVI CDP PORTFOLIO, LLC, Appellee/Cross-Appellant**

**On Appeal from the 424th District Court**

**Llano County, Texas**

**Trial Court Cause No. 16830**

### O P I N I O N

This is a declaratory judgment case involving the construction of a contract dated January 31, 2005 (the Contract), between Horseshoe Bay Resort, Ltd. (the Resort) and Centex Homes d/b/a Centex Destination Properties (Centex). Appellee CRVI CDP Portfolio, LLC (Cypress) is Centex's successor in interest under the Contract.

The Resort owns and operates a lake and golf resort in Horseshoe Bay named Horseshoe Bay Resort. Centex purchased real property (the Property) adjacent to Horseshoe Bay Resort to develop 375 condominiums; the project became known as "The Waters." To enhance the sales of the condominiums, Centex entered into the Contract with the Resort for Centex "and its successors and assigns" to obtain rights to use certain resort amenities and to obtain resort memberships "for each residential unit developed and/or constructed by Centex on the Property." Section 3 of the Contract provided that the Resort would reserve up to 375 resort memberships for Centex and that the memberships would be available with discounted initiation fees. The Contract had certain limitations, including a disputed expiration date of January 31, 2010.

After executing the Contract, Centex constructed approximately 160 residential units of the planned 375 units on the Property. As Centex constructed and developed the residential units, it reserved memberships and purchased prepaid initiation fees. Centex purchased prepaid membership initiation fees for 150 of the reserved memberships. Centex also constructed a marina to be used exclusively by owners of the Waters residential units, their families, and their guests. Ultimately, Centex was unable to continue the project, and Centex sold the Property and assigned its rights in the Contract to MDR Waters, L.P. In August 2009, Cypress purchased the Property. MDR Waters assigned to Cypress forty-two of the prepaid initiation fees and "[a]ll other rights, privileges and appurtenances owned by Assignor and in any way related to the Project."

On January 11, 2010, Cypress sent the Resort a letter with a check offering to prepay discounted initiation fees to reserve 100 additional memberships at a price of $1,500 each. Because no additional units had been developed or constructed after those built by Centex, the Resort rejected the offer and returned the check.

Cypress filed suit against the Resort on January 28, 2010, seeking a declaratory judgment that the Resort must reserve up to 375 resort memberships; that Cypress has the right to prepurchase discounted membership fees in bulk (at least fifty or more) at $1,500 each for an indefinite period; that the forty-two prepaid initiation fees assigned to Cypress do not expire; that, subsequent to January 31, 2010, Cypress has the right to prepurchase individual resort memberships on the most favorable terms available; and that Cypress has the right to sell or lease boat slips at the Waters marina to the general public.

The Resort filed a motion for summary judgment, claiming that all rights to discounted-fee memberships had terminated based on the January 31, 2010 deadline in the Contract. Cypress then filed a motion for partial summary judgment, arguing that the January 31, 2010 deadline in Section 3 applied to discounted prepaid membership fees paid by individuals but not to bulk prepaid membership fees purchased by Centex.[1] The trial court denied both motions in part and granted both motions in part.

Both parties argued that the Contract was unambiguous, but they disagreed on their reading of Sections 3 and 6. The trial court concluded that the Contract was unambiguous when read as a whole and could be construed and enforced as written. The trial court then made the following rulings:

> A. The Contract does not expire, but some [of its] provisions therein are time limited.

> B. The Contract can be assigned subject to the existing enforceable terms of the Contract at the time of the assignment.

---

[1]Under subsection 3.2, Centex had the right to prepay initiation fees for each residential unit constructed and/or developed on the Property before Centex sold the units to a third party; however, if Centex elected to make any such prepayment "for at least fifty (50) Initiation Fees," the amount for each fee would be $1,500. For convenience, we have referred to these as "bulk prepaid initiation fees" as Cypress does.

C. The Contract was assigned to Cypress effective August 14, 2009, and Cypress is the successor in interest to Centex under the Contract.

D. Cypress was assigned and owns 42 prepaid Initiation Fees for Resort Memberships, and those prepaid Initiation Fees do not expire.

E. Paragraph 3.1 has no expiration date and does not expire. The Contract requires The Resort to reserve up to 375 Resort Memberships for Centex and its assigns. Centex prepaid 150 Initiation Fees for Resort Memberships and then assigned 42 of those prepaid Initiation Fees to Cypress. Thus, the Contract requires The Resort to reserve up to 267 Resort Memberships for Cypress: the 42 Resort Memberships for which prepaid Initiation Fees have been assigned to Cypress and up to 225 additional Resort Memberships for Cypress. There is no expiration date for this reservation.

F. Paragraphs 3.1.1, 3.1.2, and 3.1.3 are time limited and expired on January 31, 2010.

G. Paragraph 3.2 does not expire. Thus, Cypress's right to prepay Initiation Fees for residential units constructed and/or developed on the Property does not expire. If Cypress elects to make such prepayments, and each prepayment is for at least 50 Units, the amount of each prepaid Initiation Fee shall be $1,500.00 each.

H. Cypress-related applicants are not guaranteed Memberships at the Resort. Cypress-related applicants must comply with the application and approval procedures then required for all other parties seeking Membership at the time of the application. However, the Resort may not "freeze out" Cypress applicants by stating that The Resort is full or otherwise reject or prejudice Cypress-related applicants simply because of their affiliation with Cypress. Cypress applicants shall be entitled to the most favorable terms available.

I. The marina [built by Centex] at the Waters is for the exclusive use of the owners of residential units (and their families, guests, and their respective successors and assigns)[,] and the Contract

restricts Cypress to selling or renting boat slips only to the Waters residents.

## *The Issues on Appeal*

The Resort presents the following issues:

1. Whether the right to membership reservations and right to discounted initiation fees for each membership set out in paragraph 3 of the Contract expired on January 31, 2010?

2. Whether the trial court erred by not considering evidence of surrounding circumstances of the Contract?

3. Whether the trial court erred by finding the Contract unambiguous and by refusing to consider extrinsic evidence of the parties' intent?

4. Whether the trial court erred in declaring that the Resort may not "freeze out" applicants when there was no summary judgment evidence that the Resort had attempted any such "freeze out"?

5. Whether Cypress was assigned rights to reserve memberships and rights to discounted initiation fees set out in paragraph 3 of the Contract?

Cypress presents the following issues in its cross-appeal:

1. Did the trial court err in concluding that Sections 3.1.2 and 3.1.3 [dealing with membership rates, terms, and conditions] expired on January 31, 2010?

2. Did the trial court err in concluding that the Contract restricts Cypress to selling and renting boat slips only to residents of the Property?

3. Did the trial court err in refusing to award attorneys' fees and costs to Cypress?

When reduced to the essentials, we are called upon to decide the following:

1. Is the Contract ambiguous as to the length of time the Resort must reserve memberships for residential units constructed and/or developed by Cypress or its assigns? For reasons stated later in this opinion, we hold that the Contract is ambiguous on this subject and the trial court should have considered extrinsic evidence on the issue. We reverse and remand this issue for trial.

2. Is the Contract ambiguous as to the length of time during which the rights to the forty-two prepaid discounted initiation fees held by Cypress may be used by purchasers of the Waters residential units? For reasons stated later, we hold that the Contract is ambiguous on this subject and that the trial court should have considered extrinsic evidence on this issue. We reverse and remand this issue for trial.

3. Is the Contract ambiguous as to the length of time that Centex and its assigns were able to exercise rights to the discounted initiation fees? For reasons stated later, we hold that the Contract is not ambiguous—all rights to discounted initiation fees ended on January 31, 2010—and we reverse this part of the trial court's judgment and render judgment for the Resort.

4. Is the marina built by Centex at the Waters for the exclusive use of the owners of the Waters residential units? May Centex and its assigns sell and rent boat slips to the general public? For reasons stated later, we affirm the trial court's judgment that the marina is for the exclusive use of the owners of the Waters residential units and that Centex and its assigns are restricted to selling and renting boat slips only to owners of the Waters residential units.

5. Did the trial court err when it did not award attorneys' fees to Cypress? We affirm the trial court's denial of attorneys' fees.

6. Did the trial court err when it declared that the Resort may not "freeze out" Cypress-related applicants for Resort membership because of their affiliation with Cypress? Because this decision was an advisory opinion on the part of the trial court, we reverse and render on this issue.

Therefore, we affirm in part, reverse and remand in part, and reverse and render in part.

*Standard of Review*

When cross-motions for summary judgment are filed and the trial court grants one and denies the other, we review all issues presented and enter the judgment that the trial court should have entered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394 (Tex. App.—Eastland 2007, no pet.). The standard of review of summary judgments is well-settled. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546 (Tex. 1985); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex. 1979).

The primary concern of a court in construing a contract is to ascertain and give effect to the parties' intentions as expressed in the writing itself. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). To discern the parties' intent, we must examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none of the provisions will be rendered meaningless. *El Paso Field Servs.*, 389 S.W.3d at 805. We are to look at the contract as a whole in light of the circumstances present when the contract was entered. *Nat'l Union Fire Ins.*, 907 S.W.2d at 520. No one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). The *Forbau* court stated further that, "when a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control." *Id.* at 133–34.

We begin by analyzing the contract's express language. *El Paso Field Servs.*, 389 S.W.3d at 805–06. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in the light of the circumstances present when the contract was entered. *Nat'l Union Fire Ins.*, 907 S.W.2d at 520. Even if both parties assert that a contract is unambiguous, a court may hold that a contract is ambiguous. *Coker v. Coker*, 650 S.W.2d 391, 392–94 (Tex. 1983). A court may also conclude that a contract is ambiguous even though the parties did not plead ambiguity. *Sage Street Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

A contract is ambiguous when its meaning is uncertain and doubtful or when it is reasonably susceptible to more than one meaning. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Coker*, 650 S.W.2d at 393–94. Only when a contract is determined to be ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Nat'l Union Fire Ins.*, 907 S.W.2d at 520. When the meaning of the contract is plain and unambiguous, a party's construction is immaterial. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981).[2]

As a preliminary matter, we point out that Sections 3.1, 3.2, and 3.4 all refer to a residential unit "developed and/or constructed" by Centex. "[D]eveloped" and "constructed" are adjectives modifying the noun "residential unit." The expression "and/or" is a legal and business expression dating from the mid-19th century and

---

[2]Two excellent sources for Texas law on contract interpretation are Richard R. Orsinger, *The Law of Interpreting Contracts*, State Bar of Texas, Advanced Civil Appellate Practice Course (Sept. 6–7, 2007), and Mark K. Glasser and Keith A. Rowley, *On Parol: The Construction and Interpretation of Written Agreements and the Role of Extrinsic Evidence in Contract Litigation*, 49 Baylor L. Rev. 657 (1997). For a full discussion of the interpretation of contracts and statutes, see Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (Thomson/West 2012).

has been criticized for years. Bryan A. Garner, *A Dictionary of Modern Legal Usage*, 56–57 (2d ed. 1995). The literal sense of "and/or" is "both or either." As used in the Contract, the terms appear to be synonymous in describing "developed and/or constructed" residential units. If anything, "developed" must mean something more than "constructed." To develop land means "to make suitable for commercial or residential purposes." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 341 (11th ed. 2004). We consider the adjective "developed" in the Contract to mean that the residential unit is completely finished and ready for sale.[3]

*Is the Contract Ambiguous?*

In the Resort's second and third issues, it argues that the trial court erred (a) by not considering evidence of surrounding circumstances of the contract, citing *National Union*, 907 S.W.2d at 520, and (b) by finding the Contract unambiguous and, therefore, refusing to consider extrinsic evidence of the parties' intent. We begin by looking at the express language in the Contract.

One minor difficulty with the briefs, the Contract, and the declaratory judgment is that Section 3 and its subsections are at times referred to as paragraphs and at times as sections. Section 3 (Memberships) has four subsections: 3.1, 3.2, 3.3, and 3.4. The first subsection, 3.1, has three sub-subsections: 3.1.1, 3.1.2, and 3.1.3. To avoid the sub-subsection title, we will refer to 3.1, 3.2, 3.3, and 3.4 as sections, and 3.1.1, 3.1.2, and 3.1.3 as subsections. Because of its importance, we set forth the entire Section 3, emphasizing certain phrases:

3. MEMBERSHIPS

3.1. HB Resort shall reserve in favor of Centex and its successors and assigns of the Property, *for each residential unit developed and/or constructed by Centex on the Property*, one (1) of each class or level of membership [and their progeny] (each a

---

[3]See subsection 3.1.1: "Until Centex completes *the sale* of all residential units to be *developed on the Property* . . . ." (emphasis added).

"Membership") then being offered by HB Resort for the use of the Resort Amenities; *provided, however, that the number of Memberships reserved for Centex and its successors and assigns of the Property shall not exceed 375 Memberships.* For purposes of this Contract, the term "Resort Amenities" shall mean the amenities set forth in Exhibit D and any replacements, substitutions or relocation of such Resort Amenities. Resort Amenities shall not include any amenities and/or golf courses HB Resort develops or acquires after the Effective Date unless and until HB Resort notifies Centex in writing that HB Resort elects to include such amenity within the definition of Resort Amenities; provided, however, Resort Amenities shall always include those additional amenities and/or golf course(s) developed and/or offered by HB Resort at the Resort which are available for use and included under any Membership issued by HB Resort pursuant to this Contract. *Centex and its successors and assigns of the Property shall have the following rights with respect to Memberships:*

3.1.1. *Until Centex completes the sale of all residential units to be developed on the Property or the fifth anniversary of the Effective Date, whichever occurs first,* the initiation, entrance or other fee imposed for a new member (the "*Initiation Fee*") for each Membership shall be the lesser of (i) Five Thousand and No/100 Dollars ($5,000.00) or (ii) the amount of such fee then being charged by HB Resort for such Membership;

3.1.2. [E]ach Membership shall have the same rates, terms, conditions and privileges that are then being charged to or imposed upon such class and/or level of Membership. *After the issuance of any Membership pursuant to this Section 3*, if and to the extent that HB Resort charges a lower Initiation Fee for any Membership to any third party, then each member shall receive a credit to compensate such member for any difference between the Initiation Fee paid by such member and the lower Initiation Fee. HB Resort shall, within thirty (30) days after receiving a written request therefore, provide Centex and its agents and representatives with such supporting documentation as

HB Resort deems reasonably necessary and appropriate to verify the rates, terms and conditions at which Memberships are being offered and sold to any third party; *and*

3.1.3. HB Resort will maintain an unaccompanied guest program for its Membership. Such program will include access privileges to Resort Amenities for unaccompanied guests of members, which access privileges shall be on such terms and conditions and at such rates as HB Resort shall establish in its sole discretion ("Unaccompanied Guest Terms").

3.2. Centex shall, from time to time, have the right to prepay, in advance and in such number and such increments as determined by Centex in its sole discretion, Initiation Frees [sic] *for each residential unit constructed and/or developed on the Property by Centex prior to the date such unit is transferred to any third party by Centex, and such prepaid Initiation Fees can be subsequently transferred and assigned by Centex to any future owner of such residential unit, without the consent of HB Resort, provided such owner is accepted for Membership by HB Resort.* If Centex elects to make any such prepayments of Initiation Fees, and each prepayment is for at least fifty (50) Initiation Fees, then, *notwithstanding anything contained in Section 3.1.1 to the contrary*, the amount of the prepaid Initiation Fees shall be fixed at Three Thousand and No/100 Dollars ($3,000.00) each. Centex shall notify HB Resort upon such assignment and transfer and shall provide HB Resort with such additional information that HB Resort reasonably requires regarding the assignee of such prepaid Initiation Fee.

3.3. HB Resort hereby represents and warrants to Centex that, as of the Effective Date, it offers those certain classes of Memberships more particularly described on Exhibit D on the terms and conditions set forth therein.

3.4. Each owner of a residential unit developed and/or constructed by Centex on the Property seeking to obtain a Membership in accordance with the terms of this Contract shall comply with the standard application and Membership approval

procedures then required by HB Resort for all other parties seeking Membership at the Resort at the time of such application (emphasis added).

On April 13, 2005, Centex and the Resort executed a first amendment to the Contract. The amendment changed the amount of the discounted initiation fee in Section 3.1.1 from $5,000 to $2,500 and changed the amount of the discounted initiation fee in the second sentence of Section 3.2 from $3,000 to $1,500. Otherwise, the language in the entire Section 3 remained the same.[4]

Section 3.1 begins by stating that the Resort shall reserve in favor of Centex "for each residential unit developed and/or constructed by Centex on the Property" one membership then being offered by the resort for the use of resort amenities—provided, however, that the number of memberships reserved shall not exceed 375 memberships. Section 3.1 is silent on how long Centex may require the Resort to reserve memberships for the residential units built by Centex. The same is true for the forty-two prepaid initiation fees now held by Cypress. The Contract is silent on how long the Resort must reserve the forty-two memberships for the Waters residential unit owners.

There are two or three reasonable interpretations of how long the Resort must reserve the memberships for residential units constructed and/or developed by Centex. One interpretation, argued by the Resort, is that the reservation mandate ended after the five-year period because Section 3.1 states that Centex "shall have the following rights with respect to Memberships" and then subsection 3.1.1 limits the discounted initiation fee "for each Membership" to the five-year period. Each membership means all memberships; therefore, subsection 3.1.1 implicitly limits the right to reserve memberships to that five-year period.

_____

[4]There was a second amendment dated July 20, 2005, but it is not relevant to the issues here.

A second interpretation is that the reservation mandate continues only for a reasonable period during which Centex or its assigns must finish the construction of residential units to reserve memberships. A condition precedent is an event the occurrence of which renders an obligation enforceable. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976); *Pearcy v. Envtl. Conservancy of Austin & Cent. Tex., Inc.*, 814 S.W.2d 243 (Tex. App.—Austin 1991, writ denied). Performance of a condition precedent must occur within a reasonable time. *Pearcy*, 814 S.W.2d at 245–46. Section 3.1 only requires the Resort to reserve a membership "for each residential unit developed and/or constructed by Centex on the Property." The term "developed and/or constructed" is in the past tense. Thus, although Centex had no duty to construct residential units within any definite period, Centex was required to perform this condition precedent of constructing residential units ready for sale within a reasonable time before the Resort was required to reserve memberships.

Cypress argues for a third interpretation. Cypress's and the trial court's reading of Section 3.1 is that it stands alone (and apart from its subsection 3.1.1) and requires the Resort to reserve the remaining 225 memberships for infinity or for the period until Cypress has constructed sufficient units to reach 375 residential units, whenever that construction might be completed. Cypress's interpretation is contrary to practical business sense. A club needs active members using the club as quickly as possible, and the club must have some limit on the number of members who will use the facilities. Too many members, for example, might overcrowd the golf courses or the other facilities. Usually, there is an optimum number of members for a club's facilities.

We agree with Cypress that the Contract does not provide that Centex must construct and develop 375 residential units within five years; however, Section 3.1 required that Centex first meet the condition precedent of having constructed

13

residential units before the Resort had an obligation to reserve memberships. And Section 3 of the Contract clearly reflects that the discounted initiation fees were an incentive to have them built within five years. Section 3.2 states that Centex has the right to purchase prepaid initiation fees "for each residential unit constructed and/or developed on the Property by Centex." Section 3.4 states that "[e]ach owner of a residential unit developed and/or constructed by Centex" seeking to become a member must comply with the standard application and membership approval procedures applicable to all applicants. The condition precedent is clear, but that still leaves the question of whether the Resort must reserve memberships beyond the five years and, if so, for how long.

Where a written agreement does not include the entire agreement of the parties, parol evidence is admissible to show collateral agreements that are not inconsistent with and do not vary or contradict the integrated, unambiguous terms of the writing. *See Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 175 (5th Cir. 1990); *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958).

In *Bob Robertson, Inc. v. Webster*, 679 S.W.2d 683, 688–89 (Tex. App.—Houston [1st Dist.] 1984, no writ), the written contract referred repeatedly to "delivery," but made no provision for the date of delivery. TEX. BUS. & COM. CODE ANN. § 2.309 (West 2009) provided that, where no time was agreed upon, the delivery must be within a reasonable time. The court held that the parol evidence rule did not prohibit evidence of an oral agreement between the dealer and the customer that the truck would be delivered within ten weeks. 679 S.W.2d at 688–89. There was no conflict between the terms of the written contract and the oral representations of the sales manager. *Id.*

It has long been established in Texas that, where no time limit is provided, the law will impose a reasonable time for performance. *See Cheek v. Metzer*, 291 S.W. 860, 863 (Tex. 1927); *Tex. Farm Bureau Cotton Ass'n v. Stovall*, 253 S.W.

14

1101, 1106 (Tex. 1923). Normally, what is a reasonable time is a question of fact that must be determined by the circumstances in evidence surrounding the situation of the parties and the subject matter under which the contract was executed. *Metzer*, 291 S.W. at 863–64.

But where the material facts are undisputed, the question of what is a reasonable time has been held to be a matter of law. *Pearcy*, 814 S.W.2d at 246; *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 243 (Tex. App.—Houston [1st Dist.] 1987, writ denied). In *Pearcy*, the Pearcys agreed to sell twelve acres to the Conservancy for $6,350 per acre. The Conservancy agreed that it would pay an additional purchase price based on the highest price per acre that it might pay for either the Maseles or the Brandes property nearby; there was no time limit on this promise. Nine months after the Pearcy conveyance, the Conservancy purchased the Maseles property for $7,060 per acre, and the Conservancy paid the Pearcys an additional $710 per acre for their twelve acres. 814 S.W.2d at 244.

Nine years after the Pearcy transaction, the Conservancy acquired the Brandes property for $34,434 per acre. *Id.* at 245. The court held that the agreement to pay additional consideration had expired because nine years was not a reasonable time as a matter of law. *Id.* at 246–47. The court stated that Texas courts have repeatedly held that, where a contract does not provide a time for performance, the law will imply that performance must occur within a reasonable time. *Id.* at 246 (citing *ACF Petroleum Co.*, 746 S.W.2d at 243; *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 622 (Tex. App.—Houston [1st Dist] 1987, no writ.); and *Heritage Res., Inc. v. Anschutz Corp.*, 689 S.W.2d 952, 955 (Tex. App.—El Paso 1985, writ ref'd n.r.e.)).

The Resort attached extrinsic evidence to its motion for summary judgment. Joe Arcisz, division president of Centex who negotiated and signed the Contract

15

for Centex, testified at his deposition that, based on its market research, Centex expected to construct and sell 375 residential units within a five-year period. Therefore, Centex was comfortable with the five-year period limitation. Arcisz stated that Centex understood that for five years it could offer potential buyers of the units a membership to the Resort at a discounted price but that, after five years, that benefit would have to be renegotiated.

In 2007, Centex put together a bid package for prospective buyers of its Project assets. The Resort was one of the firms interested in purchasing the assets. In a letter dated July 17, 2007, from the senior vice president and chief legal officer of Centex to Ron Mitchell, vice chairman of the board of the Resort, Centex included a copy of the package. Under "Amenities Information," Centex made the following statement that confirms Arcisz's testimony concerning the five-year period, although the Resort had not reserved 375 memberships at the time:

> The owner of the Horseshoe Bay Resort amenities has reserved, for purchase by Centex and ultimate use by owners at The Waters, a maximum of 375 membership initiation fee waivers that allow owners to apply for Horseshoe Bay Resort membership. The waivers allow new owners to apply for membership without paying the current membership initiation fee of $15,000. As of March 31, 2007, Centex had acquired 150 of such membership waivers. The remaining 225 membership waivers can be purchased from Horseshoe Bay at a cost of $1500 each by calendar year 2010.

The affidavit testimony of Michael Mallick, who negotiated and signed the Contract for the Resort, shows that the terms relating to membership "(including reserved memberships, discounted initiation fees and prepaid initiation fees) in paragraph 3 of the Contract" expired after five years. Mitchell, vice chairman of the board of the Resort, confirmed Mallick's statement in his affidavit.

The extrinsic evidence was admissible to explain the course of dealings between the parties and the circumstances surrounding the execution of the Contract. *See Gorbett Bros. Steel Co., Inc. v. Anderson, Clayton & Co.*, 533 S.W.2d 413, 418 (Tex. Civ. App.—Houston [1st Dist.] 1976, no writ). The extrinsic evidence was also admissible to resolve the ambiguity gap of how long the Resort must reserve memberships and the length of the period that a new Waters resident who joins the Resort may use one of the forty-two discounted initiation fees. Where an instrument is incomplete on its face, extrinsic evidence may be admitted to show the part that is missing, provided the evidence does not conflict with the written provisions. *Martin v. Ford*, 853 S.W.2d 680, 681–82 (Tex. App.—Texarkana 1993, writ denied).

We overrule the Resort's first issue in part and sustain the Resort's second and third issues in part: Section 3.1 is ambiguous as to the length of time the Resort must reserve memberships for residential units developed and/or constructed by Centex or its assigns, and extrinsic evidence will be admissible on that narrow issue on remand. Section 3 is ambiguous on the length of time that the forty-two discounted initiation fees held by Cypress may be used by members who have purchased residential units built by Centex or its assigns. Extrinsic evidence will also be admissible on that narrow issue on remand.

The extrinsic evidence, however, was not admissible to construe unambiguous portions of the Contract. Sections 3.1 through 3.4 are otherwise unambiguous.

*The Discounted Initiation Fees*

The Contract is not ambiguous concerning the length of time that Centex and its assigns were to have rights to discounted initiation fees. All rights of Centex and its assigns to discounted initiation fees terminated on January 31, 2010.

17

Courts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction. *Gen. Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 522 (Tex. App.—Fort Worth 1995, no writ). Grammatical usage is not separate from textual meaning. Section 3.1 and its subsections (3.1.1, 3.1.2, and 3.1.3) are to be read together. The last sentence in Section 3.1 makes that clear:

> Centex and its successors and assigns of the Property shall have the following rights with respect to Memberships:

The phrase "shall have the following rights with respect to Memberships" limits the rights with respect to all memberships referred to in Section 3.1. Centex was to have the rights listed in subsections 3.1.1, 3.1.2, and 3.1.3. Punctuation is an indicator of meaning. The colon at the end of Section 3.1 is important.

Subsection 3.1.1 first provides that, "[u]ntil Centex completes the sale of all residential units to be developed on the Property or the fifth anniversary of the Effective Date, whichever occurs first," the initiation fee for a new member "for each Membership" shall be the lesser of $2,500 or the amount of the fee then being charged by the Resort for such membership. Both Section 3.1 and its subsection 3.1.1 refer to "each Membership," meaning *every* membership or *all* memberships. Both the Resort and Cypress agree that the fifth anniversary date of January 31, 2010, occurred first. Cypress also agrees that the right to discounted initiation fees referred to in subsection 3.1.1 ended on January 31, 2010.

Subsection 3.1.1 ends with a semicolon, and subsection 3.1.2 ends with a semicolon and the word "and," indicating that subsections 3.1.2 and 3.1.3 are part of the sentence that begins with "Until Centex" at the beginning of subsection 3.1.1. Thus, subsections 3.1.1, 3.1.2, and 3.1.3 are all limited by the five-year period.

Cypress takes the anomalous position that subsection 3.1.1 limited the right to a discounted initiation fee paid by or for a new individual member to the five-year period but that Section 3.2 allows Cypress to continue to have the right to purchase bulk prepaid initiation fees for $1,500 each and then assign them later to new individual members who own units at the Waters. Cypress's reading of Section 3.2, as if it stands alone, makes the first sentence in Section 3.2 problematic. The sentence does not state how much Centex must pay for a prepaid membership initiation fee if it purchases less than fifty at one time, and Section 3.2 does not expressly give Centex any right to reserve memberships.

We must harmonize and give effect to all of the provisions of the contract so that none of the provisions will be rendered meaningless. *El Paso Field Servs.*, 389 S.W.3d at 805. By reading and harmonizing Sections 3.1, 3.2, 3.3, and 3.4 together, it is clear that Centex was given the prepayment right to purchase prepaid initiation fees for $2,500 each (by referring to subsection 3.1.1) if Centex purchased fewer than fifty prepaid initiation fees or for $1,500 each if Centex purchased fifty prepaid fees in bulk.

Section 3.2 contains the condition precedent of initiation fees being "for each residential unit constructed and/or developed on the Property," the same condition for reserving memberships in Section 3.1. Section 3.2 allows Centex to purchase the prepaid initiation fees "prior to the date such unit is transferred to any third party by Centex" and then transfer the prepaid initiation fees to future owners of units. In all cases, the discounted initiation fee is utilized when the Waters resident has been accepted for membership.

Subsection 3.1.1 states that "the initiation, entrance or other fee imposed for a new member (the '**Initiation** Fee') for each Membership" shall be the lesser of $2,500 or the amount then being charged by the Resort (emphasis added). Each membership is for a residential unit constructed by Centex (Sections 3.1 and 3.2),

19

provided that the residential unit owner is accepted for membership (Sections 3.1, 3.2 and 3.4). Section 3.2 simply allows Centex to purchase prepaid initiation fees individually and in bulk before the completed residential unit is sold. Section 3.2 states that those prepaid discounted initiation fees can be "assigned by Centex to any future owner of such residential unit, without the consent of HB Resort, provided such owner is accepted for Membership by HB Resort." Obviously, the right to any discounted prepaid initiation fee referred to in Section 3.2 was to be used by a new member who had purchased a residential unit, just as the discounted initiation fee paid by a new member (referred to in subsection 3.1.1) was a right assigned by Centex to be used by that new member who had purchased a residential unit. In both situations, the new member has been assigned a right by Centex to a discounted initiation fee whether the amount is $2,500 or $1,500.[5]

Section 3.2 must be read with subsection 3.1.1. Subsection 3.1.1 defines the term "Initiation Fee," and Section 3.2 uses the defined term throughout. Section 3.2 states in its second sentence that, "notwithstanding anything contained in Section 3.1.1 to the contrary, the amount of the prepaid Initiation Fees shall be fixed at [$1,500] each." Superordinating language (signaled by notwithstanding or despite) merely shows which provision prevails in the event of a clash but does not necessarily denote a clash of provisions.[6] The only clash between Section 3.2 and subsection 3.1.1 is the amount of the discounted initiation fee for a new member: under Section 3.2, the amount is $1,500 if prepurchased in bulk (or $2,500 if not prepurchased in bulk) and under subsection 3.1.1, the amount is $2,500.

---

[5]The phrase "imposed for a new member" in subsection 3.1.1 indicates that the new member may pay the discounted initiation fee or Centex may pay it for that member by using one of the purchased prepaid initiation fees.

[6]*See* Scalia and Garner, at p. 126.

20

If Sections 3.1, 3.2, 3.3, and 3.4 are read together, they are also easily harmonized under the presumption of consistent usage.[7] Section 3.1 and its subsections 3.1.1 and 3.1.2 refer to "each Membership." Subsection 3.1.2 provides that "each Membership shall have the same rates, terms, conditions and privileges that are *then* being charged to or imposed upon such class and/or level of Membership" (emphasis added). Section 3.2 refers to an "owner of such residential unit" being accepted for membership. Section 3.3 refers to Exhibit D, which describes the classes of memberships that the Resort offered on the "Effective Date." Section 3.4 states that "[e]ach owner of a residential unit developed and/or constructed by Centex on the Property seeking to obtain a Membership in accordance with the terms of this Contract shall comply with the standard application and Membership approval procedures then required by HB Resort."

The Resort correctly rejected Cypress's attempt to purchase one hundred prepaid initiation fees for two reasons. First, all rights to any discounted initiation fee terminated on January 31, 2010. Section 3.1 and its subsection 3.1.1 placed an express time restriction on the right to a discounted initiation fee for "each Membership." Second, Cypress had not constructed and/or developed any additional residential units in addition to those constructed by Centex. Section 3.2 clearly limited Centex's right to purchase in advance only "Initiation Fees for each residential unit constructed and/or developed on the Property."

We sustain the Resort's first issue to the extent that all rights to all discounted Initiation Fees in Section 3 terminated on January 31, 2010. We also overrule Cypress's first issue in its cross-appeal.

---

[7]*See* Scalia and Garner, at p. 170 (on the presumption of consistent usage canon: a word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning).

*Boat Slips at the Resort's Marina*

Section 2 also supports the conclusion that the Resort and Centex contemplated that the construction and sale period for the 375 residential units was to be five years or less. Section 2 provides that boats slips at the existing Resort marina will be available to Centex for the same period expressed in subsection 3.1.1:

> Until Centex completes the sale of all residential units to be developed on the Property or the fifth anniversary of the Effective Date, whichever occurs first, HB Resort shall make available for Centex's use up to fifty (50) boat slips located within the existing marina at the Resort (the "Marina") in the location(s) described on Exhibit C attached hereto . . . for the exclusive use and enjoyment of Centex and its successors and assigns of the Property so long as such party using the Boat Slip holds any class or level of Membership (as hereinafter defined) . . . .

Section 2 further provides that members who purchase a residential unit from Centex and lease a boat slip during the limited period have the option of renewing their one-year lease of the boat slip at the same rates, terms, and conditions then being charged to other members by the Resort.

*Boat Slips at the Marina Built by Centex*

In the second issue in Cypress's cross-appeal, Cypress argues that the trial court erred in concluding that the Contract restricts Cypress to selling and renting boat slips only to owners of residential units on the Property. We disagree. The trial court correctly held that the marina built by Centex at the Waters is for the exclusive use of the owners of residential units on the Property (and their families, guests, and respective successors and assigns) and that the Contract restricts Cypress to selling or renting boat slips only to the Waters residents.

Section 6 of the Contract, entitled "Construction of Certain Improvements on Property," provides as follows:

> HB Resort acknowledges and agrees that Centex and its successors and assigns may, after Centex acquires title to the Property and upon receiving the prior written consent of HB Resort, which consent will not be unreasonably withheld or delayed, develop and/or construct swimming pools, fitness centers, a marina and other related amenities on the Property (collectively, the "Centex Amenities") *to be used exclusively by the owners of residential units developed and/or constructed by Centex on the Property* (and their families, guests and their respective successors and assigns). *Anything herein to the contrary notwithstanding, except for boat slip sales or rental at the marina, the Centex Amenities shall not include any for-profit activities or commercial enterprises, including but not limited to those that would compete with any Resort Amenities* (emphasis added).

Cypress argues that the second, and final, sentence does not expressly provide that boat slips may only be sold or rented to residents. We disagree. The first sentence limits the Centex Amenities, including the marina, to be used exclusively by the owners of residential units developed and constructed on the Property. The second sentence provides that, anything to the contrary notwithstanding, the Centex Amenities shall not include any for-profit activities or commercial enterprises, including but not limited to those that would compete with any Resort Amenities. This prohibition would preclude all for-profit activities or commercial enterprises such as selling or renting boat slips. But the parties made an exception to the prohibition of for-profit activities or commercial enterprises: Centex could make a profit on sales or rentals of boat slips at the marina.

The Contract does not make an exception to the limiting language in the first sentence that limits Centex Amenities to be used exclusively by the owners of residential units on the Property (and their families, guests, and respective

successors and assigns).  A person renting or purchasing and then using a boat slip at the Centex marina has to be an owner of a residential unit of the Waters.

Section 6 of the Contract prohibits Cypress from selling or renting boat slips to anyone other than owners of the Waters residential units.  There should have been a comma after "marina" (just before "and other related amenities on the Property") in the first sentence of Section 6.[8]  But it is clear that the Centex marina is one of the "Centex Amenities." Anyone purchasing or renting a boat slip at the Centex marina will be using an integral part of the marina.  Cypress's second issue is overruled.

*Attorneys' Fees*

The trial court did not award attorneys' fees or costs to either side.  In Cypress's third issue in its cross-appeal, Cypress argues that the trial court erred in refusing to award attorneys' fees and costs to Cypress.  Cypress is not the prevailing party in this lawsuit; therefore, Cypress is not entitled to attorneys' fees under Section 12 of the Contract or under TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008).

The decision to grant or to deny attorneys' fees in a declaratory judgment action under TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 is a matter that is within the discretion of the trial court.  An award of attorneys' fees will not be reversed on appeal absent a clear showing that the trial court abused that discretion.  *Oake v. Collin Cnty.*, 692 S.W.2d 454, 455 (Tex. 1985).  In the exercise of its discretion in a declaratory judgment action, the trial court may award attorneys' fees to the prevailing party, may decline to award attorneys' fees to either party, or may award attorneys' fees to the non-prevailing party, regardless of which party sought

---

[8]Bryan A. Garner, *Legal Writing in Plain English*, 148 (The University of Chicago Press 2001) ("1.4 Use a comma to separate items in a series—including the last and next-to-last").

declaratory relief. *Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 313 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In view of our decision, Cypress is not entitled to any attorneys' fees or costs. We overrule Cypress's third issue.

*The "Freeze Out" Issue*

In the Resort's fourth issue, it argues that the trial court erred in declaring that the Resort may not "freeze out" Cypress-related applicants from memberships because of their affiliation with Cypress. A declaratory judgment is available only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). There was no evidence that the Resort had taken steps to "freeze out" such Cypress-related applicants. The ruling by the trial court amounted to an advisory opinion. *See Tex. Health Care Info. Council v. Seton Health Plan, Inc.*, 94 S.W.3d 841, 846 (Tex. App.—Austin 2002, pet. denied). We sustain the Resort's fourth issue.

*Summary*

The Contract is ambiguous in Section 3.1 on the length of time that the Resort must reserve the remaining 225 memberships and on the length of time that a Waters residential unit owner may use one of the forty-two prepaid initiation fees. On remand, extrinsic evidence will be admissible to establish the reasonable time for those time periods.

All rights of Centex and its assigns to discounted initiation fees referred to in the Contract terminated on January 31, 2010. There was no evidence of and no justiciable controversy over the Resort attempting to "freeze out" Cypress-related applicants for Membership.

Cypress may only sell or rent boat slips at the Centex marina to owners of residential units "developed and/or constructed" by Centex (or its assigns) on the

Property.  Section 6 of the Contract does allow Cypress to make a profit in selling or renting those boat slips.

*This Court's Ruling*

We overrule the Resort's fifth issue and affirm the trial court's judgment to the extent that it determined that Cypress is the successor in interest to Centex under the Contract.  We reverse the judgment in part and remand for a trial on the issue of the length of time that the Resort must reserve the remaining 225 memberships under Section 3.1 and the length of time that the forty-two discounted initiation fees may be used by an owner of a residential unit of the Waters who joins the Resort.  We reverse the trial court's judgment in part, and we render judgment that all rights to discounted initiation fees under the Contract terminated on January 31, 2010.  We affirm the trial court's judgment to the extent that it determined that the Centex marina is for the exclusive use of the owners of the Waters residential units (and their families, guests, and respective successors and assigns) and that the Contract restricts Cypress to selling or renting boat slips only to the Waters residents.  We affirm the trial court's judgment to the extent that it determined that Cypress is not entitled to attorneys' fees.  We reverse the trial court's judgment in part, and we render judgment that Cypress is not entitled to the trial court's declaration on "freeze out" of applicants for membership in the Resort.


TERRY McCALL

JUSTICE

September 12, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.